(No. 82711.—

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. AARON PATTERSON, Appellant.

*Opinion filed August 10, 2000.*

94

HEIPLE, J., concurring in part and dissenting in part.

G. Flint Taylor, Jr., Timothy R. Lohraff and Joey L. Mogul, of the People's Law Office, of Chicago, and Abigail S. Clough, law student, for appellant.

James E. Ryan, Attorney General, of Springfield, and Richard A. Devine, State's Attorney, of Chicago (William L. Browers, Assistant Attorney General, of Chicago, and Renee Goldfarb and Carol L. Gaines, Assistant State's Attorneys, of counsel), for the People.

JUSTICE RATHJE delivered the opinion of the court:

Defendant, Aaron Patterson, appeals from the trial court's dismissal of his post-conviction petition. Because defendant was sentenced to death for the underlying murder conviction, he appeals directly to this court. See 134 Ill. 2d R. 651(a).

## BACKGROUND

### Procedural Background

A jury in the circuit court of Cook County convicted defendant of the murders of Vincent and Rafaela Sanchez. Subsequently, the jury found that there were

no mitigating factors sufficient to preclude a sentence of death, and the trial court sentenced defendant to death. Defendant appealed, and we affirmed defendant's convictions and sentence. *People v. Patterson*, 154 Ill. 2d 414 (1992). The Supreme Court denied defendant's petition for a writ of *certiorari*. *Patterson v. Illinois*, 510 U.S. 879, 126 L. Ed. 2d 175, 114 S. Ct. 219 (1993).

Thereafter, defendant filed a timely post-conviction petition. The State moved to dismiss the petition, and the trial court granted the State's motion. Defendant now appeals, arguing first that he was denied the effective assistance of counsel when his attorney failed to (a) discover and present additional evidence to support defendant's claim that his confession was coerced; (b) discover and present evidence to support defendant's motion to reopen his motion to suppress; (c) present evidence at trial that defendant's confession was coerced; (d) present, during the post-trial proceedings, new evidence relating to defendant's allegations of torture; (e) supplement the record on direct appeal or seek a remand; (f) interview witnesses who could have provided exculpatory testimony; (g) cross-examine witnesses properly; (h) seek to remove for cause the judge who presided over the pretrial proceedings; (i) argue that the trial court did not ask the proper questions during *voir dire*; (j) object to the use of residential burglary as an eligibility and aggravating factor; and (k) object to the trial court's praise of the jury. In addition, defendant argues that (1) new evidence demonstrates that the trial court erred in denying defendant's motion to suppress statements; (2) the State knowingly used perjured testimony; (3) he was denied his right to a fair trial when a police officer volunteered that defendant had taken a polygraph; and (4) the State violated its duties under *Brady v. Maryland*, 373 U.S. 83, 10 L. Ed. 2d 215, 83 S. Ct. 1194 (1963), by failing to tender the results of fingerprint examinations.

## Pretrial Proceedings

In May 1986, defendant and Eric Caine were indicted for the Sanchez murders. Their case originally was assigned to Judge James Bailey. Defendant sought a substitution of judge. Rather than randomly assigning a new judge, Judge Bailey assigned the case to Judge Arthur Cieslik. Defendant moved to vacate the assignment to Judge Cieslik, and that motion was denied. Subsequently, defendant sought leave to file a writ of *mandamus* ordering that the case be assigned randomly. This court denied defendant's motion.

Thereafter, defendant filed a motion to suppress statements that he had made while in police custody. After a hearing, the trial court denied that motion. Defendant's attorney then filed a renewed motion to suppress statements or to reopen the evidence. The crux of defendant's argument in his motions was that, to obtain defendant's confession, the police officers struck him, attempted to suffocate him, and threatened him with a gun. The trial court, Judge John Morrissey[1] presiding, denied that motion. Thereafter, defendant and Caine were simultaneously tried before separate juries.

## Defendant's Trial

The evidence at defendant's trial established that, on April 19, 1986, Chicago police officers discovered the victims' badly decomposed bodies in the Sanchez home. The police were called when Wayne Washington, a teenager who routinely performed odd jobs for Vincent, discovered that the Sanchezes' door was open and that there was blood on the floor. Washington told the police that he had seen Caine and DeEdward White across from the Sanchez house.

The police took White into custody to question him.

---

[1]The record does not reveal why defendant's case was transferred to Judge Morrissey.

about the Sanchez murders. Subsequently, Marva Hall, White's 16-year-old cousin, told the police that defendant had offered to sell her a chain saw and a shotgun. Defendant claimed that he had obtained the items from two elderly Mexicans that he had stabbed to death. Under cross-examination, Hall admitted that she had told a defense investigator that defendant had not told her that he had committed the murders. She explained, however, that she told the investigator this only because she was scared of defendant.

Several days after Hall spoke with the police, defendant was arrested on an unrelated charge. Detective James Pienta testified that, when he learned that defendant had been arrested, he questioned him about the Sanchez murders. Defendant told Pienta that Caine had approached defendant and said that he needed guns. Defendant and Caine knew that the Sanchezes had guns. They reached the house by traveling down the Illinois Central railroad tracks. Once at the house, defendant waited in the garage while Caine entered the house. Shortly thereafter, Caine came running out with a shotgun in a duffle bag, and the two fled.

When Pienta asked defendant to elaborate, defendant added that he had entered the Sanchez house and "came up like—up like a straight up Ninja" and "shanked" the "old man" because he was taking too much time to get the "good stuff." Rafaela began screaming so defendant "shanked" her too. Thereafter, defendant repeated the same story to Pienta and Assistant State's Attorney Kip Owen. At this time, defendant also stated that he had thrown the knife away on the railroad tracks. Although the police searched the railroad tracks for the knife, they never discovered it.

Former Assistant State's Attorney Peter Troy testified that defendant told him that Caine, Michael Arbuckle, "Cochise," "Rambo," and defendant went on a

"mission" to the Sanchez home to retrieve guns and drugs. The remainder of defendant's statement to Troy was consistent with his original statement to Pienta. Troy reduced this statement to writing, but defendant refused to sign it.

An assistant medical examiner testified that both victims died of stab wounds and that both had defense wounds. An expert in fingerprint identification testified that both a palmprint and a fingerprint recovered from the scene belonged to Vincent. A second fingerprint, recovered from a tape recorder, did not belong to Vincent, Rafaela, Wayne Washington, Willie Washington, Arbuckle, Caine, or defendant.

Detective William Marley testified for defendant that, after hearing defendant's statement, Owen wanted the police to perform additional investigation before he would authorize the filing charges against defendant. Carlton Ford testified that he, Steve Weathersby, and defendant were driving around in late April 1986, trying to sell a saw Weathersby owned. Ford testified that they saw Hall that day and asked her if she knew anyone who would want the saw. Ford also testified that there were no guns in the car. Defendant's former girlfriend testified that she was with defendant on the night of April 17, the night that the State contends that the Sanchezes were murdered.

## Post-Conviction Proceedings

This court affirmed defendant's sentence and conviction on direct appeal. Defendant then filed a post-conviction petition, relying largely on evidence that numerous other people had made allegations similar to defendant's about police brutality at Area 2. In particular, defendant relied on a report from the police department's office of professional standards (OPS). This report found that the abuse of prisoners at Area 2 was systemic. After allowing defendant to amend his petition, the trial

court granted the State's motion to dismiss. In dismissing the petition, the trial court stated that "any nexus between Area 2 Chicago Police Department Headquarters' alleged systemic torture of people and Aaron Patterson is highly tenuous at best." Defendant subsequently appealed.

## ANALYSIS

### Ineffective Assistance of Counsel

Defendant first raises several arguments as to how he was deprived of the effective assistance of counsel. To support a claim of ineffective assistance of counsel, a defendant must allege facts demonstrating that his attorney's representation fell below an objective standard of reasonableness and that there is a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different. *Strickland v. Washington*, 466 U.S. 668, 687, 695, 80 L. Ed. 2d 674, 693, 698, 104 S. Ct. 2052, 2064, 2068-69 (1984). A defendant must satisfy both prongs of the *Strickland* test; thus the failure to satisfy either prong precludes a finding of ineffective assistance of counsel. *People v. Shaw*, 186 Ill. 2d 301, 332 (1998). Because the trial court dismissed defendant's petition without holding an evidentiary hearing, we review that dismissal *de novo*. *People v. Coleman*, 183 Ill. 2d 366, 388 (1998).

### *Failure to Discover and Present Evidence to Support Defendant's Claim of Torture*

Defendant, who was represented by several different attorneys before his trial, asserts that each of these attorneys, along with his trial counsel and his post-trial counsel, was ineffective for failing to properly discover and present evidence that (1) Area 2 Lieutenant Jon Burge, who defendant alleges participated in torturing him, has a documented pattern of leading and participating in similar acts of torture; (2) Burge and the detec-

tives who served under him had contemporaneously beaten and abused other suspects and witnesses in defendant's case; and (3) defendant suffered psychological injury from the torture. Defendant also contends that his direct appeal counsel was ineffective for failing to raise the ineffectiveness claim with respect to his pretrial and trial counsel.

Defendant asserts that Luther Hicks, who represented defendant on his motion to suppress, was aware both of the details of defendant's torture allegations and that a red-haired officer along with Detectives Pienta, Marley, Daniel McWeeny, and Raymond Madigan were involved.

Defendant alleges that Hicks should have discovered that the red-haired officer was Burge. Further, Hicks should have discovered that his supervisor was representing Andrew Wilson and that Wilson had raised similar torture allegations against Burge. Moreover, defendant contends that Hicks should have questioned other assistant public defenders to determine if their cases involved similar torture allegations at Area 2. Defendant concludes that, had Hicks properly conducted this investigation, he would have discovered almost 50 other victims of torture at Area 2.

Further, defendant asserts that Hicks should have discovered that Burge had actively participated in a "systemic policy and practice of torture" while at Area 2 and was involved in at least 50 incidents while he was there. Moreover, he claims that Hicks should have discovered that Pienta had been involved in prior acts of beating while working with Burge. After the other officers had finished, McWeeney would often act as the "good cop" who would help the prisoner if he would cooperate.

The problem with defendant's argument is that much of the information relating to other allegations of torture would simply not have been discoverable by Hicks at the

time of the suppression hearing in 1987. At approximately the same time that defendant's case was proceeding, defendant's current attorney, G. Flint Taylor, Jr., was representing Wilson in a federal suit against the City of Chicago, Burge, and other officers. Notwithstanding the fact that Taylor had available to him the full panoply of the civil discovery process, he did not discover the vast majority of the information upon which defendant now relies until February 1989, two years after Hicks filed defendant's motion to suppress. Moreover, Taylor discovered the information relating to the other allegations of torture only because he was assisted by an anonymous police department informant.

Additionally, beyond interviewing anyone who had ever been a prisoner at Area 2, we can conceive of no manner in which Hicks reasonably could have obtained this information. At the time, the OPS had no reports indicating that several other people had been tortured. Defendant has identified no other available source that could provide this information.

After reviewing defendant's allegations and considering the facts that were known when Hicks filed the motion to suppress, we will not find Hicks ineffective for failing to discover information that only an informant could provide. Because defense counsel would not have discovered this information, defendant was not prejudiced by counsel's failure to investigate.

Defendant also alleges that Hicks should have investigated other contemporaneous allegations of torture from Caine, Arbuckle, and Illya Rowland. To support his claim with respect to Caine, defendant attaches Caine's original and amended motions to suppress. These motions allege that Caine was not informed of his *Miranda* rights, that the police officers promised him leniency, that the police officers struck him in the head and kicked him in the stomach, and that he was intoxi-

cated when he gave his statement. The motions, however, do not identify any of the officers involved or describe with any particularity misconduct similar to what defendant suffered. Without some evidence indicating that the same officers or supervisors were involved or that the same type of misconduct was involved, we have no basis upon which to conclude that this evidence was relevant to defendant's claims. See *People v. Hobley*, 159 Ill. 2d 272, 312 (1994) (holding that evidence of other allegations of torture was inadmissible, in part, because it was not similar to the allegations made by defendant).

Rowland's affidavit alleges that the officers told him to implicate defendant, but it does not assert that the officers mistreated him. Arbuckle, in his affidavit, states that an Area 2 lieutenant (whom he later identified as Burge) threatened him. He does not allege, however, that Burge or any other officer used physical coercion. His allegations are limited to asserting that the officers verbally threatened him. Because these allegations are quite different from defendant's, we are unable to conclude that they are relevant to defendant's claim. See *Hobley*, 159 Ill. 2d at 312.

After reviewing the evidence submitted by defendant, we are unable to conclude that defendant has demonstrated that, had Hicks interviewed these witnesses, a reasonable probability exists that the result of the suppression hearing would have been different.

As for defendant's claim about evidence of a psychological injury, defendant has not explained why Hicks would request a psychiatric examination of defendant. Defendant has not alleged that he told Hicks that the torture caused him psychological damage. Moreover, defendant has not alleged that any of his actions would have placed Hicks on notice that defendant had suffered a psychological injury. Without some evidence that would indicate to Hicks that defendant had suffered a psycho-

logical injury, we are unable to conclude that Hicks acted in an objectively unreasonable manner when he failed to secure a psychiatric examination of defendant.

Defendant also alleges that Hicks was ineffective in his presentation of hearsay evidence during defendant's motion to suppress. At the motion, Hicks sought to introduce etchings made by defendant in the interrogation room after he had been interrogated. Photographs that Hicks sought to introduce revealed the following etchings on the bench in the interrogation room:

"I lied about murders police threatened me with violence slapped and suffocated me with plastic—no phone—no dad signed false statement to murders (Tonto) Aaron."

"Sign false statements to murder, Tonto on statements is code word Aaron."

Additionally, the photographs revealed the phrase "Aaron lied" etched in the door of the room.

During the motion to suppress, Hicks argued that the etchings were admissible under various exceptions to the hearsay rule. The trial court rejected Hicks' argument. On appeal, defense counsel argued that the statements were admissible (1) as spontaneous declarations, (2) as prior consistent statements, and (3) under the doctrines of curative admissibility or completeness. This court rejected each of those claims. *Patterson*, 154 Ill. 2d at 452-54.

Defendant now claims that his trial and appellate attorneys were ineffective because they advanced the wrong arguments. Defendant explains that the etchings were admissible at the motion to suppress not because they fell within an exception to the hearsay rule but because hearsay is admissible at pretrial hearings in which the trial court is determining the admissibility of evidence.

The appellate court has recognized that hearsay evidence is admissible during a motion to suppress, even

though it is not admissible at trial. *People v. Lesure*, 271 Ill. App. 3d 679, 680 (1995). Moreover, federal law supports defendant's argument. Federal Rule of Evidence 104(a) provides, in relevant part, "Preliminary questions concerning *** the admissibility of evidence shall be determined by the court ***. *In making its determination it is not bound by the rules of evidence except those with respect to privileges.*" (Emphasis added.) Fed. R. Evid. 104(a). The Supreme Court has explained that no automatic rule precludes the admission of hearsay when a trial court is determining the admissibility of evidence. *United States v. Matlock*, 415 U.S. 164, 175, 39 L. Ed. 2d 242, 252, 94 S. Ct. 988, 995 (1974); see also *United States v. Bolin*, 514 F.2d 554, 557 (7th Cir. 1975) (holding that "it is clear that hearsay evidence is admissible in a hearing on a motion to suppress").

After reviewing the cases cited by defendant, we agree with defendant that they support his contention that hearsay evidence is admissible during a hearing on a motion to suppress. That, however, is not sufficient to grant defendant relief on his claim. Under *Strickland*, a defendant must demonstrate a reasonable probability that, had this evidence been presented, the result of the *proceeding* would have been different. *Strickland*, 466 U.S. at 694, 80 L. Ed. 2d at 698, 104 S. Ct. at 2068. Given the context of defendant's claim, that means that he must demonstrate that a reasonable probability exists that, had his appellate attorney argued on appeal that Hicks was ineffective, this court would have agreed. To do so, this court would have had to reach the conclusion that a reasonable probability exists that, had the etchings been introduced as admissible hearsay, the trial court would have concluded that defendant's confession should have been suppressed. With this conclusion, we cannot agree.

When Hicks presented the pictures of the etchings during the motion to suppress, the trial court, in addi-

tion to excluding them from evidence as hearsay, specifically found that it did not believe that defendant had established that the etchings in the pictures were in the same condition as the etchings were when defendant allegedly made them. Moreover, the trial court twice stated that it believed that the etchings were not relevant to the motion to suppress.

As noted by the Court in *Matlock*, although hearsay may be admissible during motions to suppress, the trial court is entitled to "give it such weight as his judgment and experience counsel." *Matlock*, 415 U.S. at 175, 39 L. Ed. 2d at 252, 94 S. Ct. at 995. Here, we know exactly how much weight the trial court would have given it, had the court considered it: none. While this conclusion is by no means binding on any subsequent trier of fact, it is sufficient to allow us to conclude that, even if Hicks had argued that the etchings were admissible hearsay, no reasonable probability exists that defendant's confession would have been suppressed.

*Failure to Investigate, Present, and Preserve Evidence During the Motion to Suppress Statements or Reopen the Motion to Suppress*

Defendant next contends that when Brian Dosch, the attorney who succeeded Hicks, sought to reopen the motion to suppress, he erred because he failed to (1) inform the court that the red-haired officer was Burge and that Burge supervised and participated in the policy and practice of torture at Area 2; (2) inform the court of the similarities between defendant's allegations of torture and Wilson's allegations; (3) document the other claims of torture by filing the "proffer"[2] prepared by Wilson's civil attorneys; and (4) subpoena Burge's record from the OPS. Defendant also alleges that Dale Coventry, Dosch's

---

[2]The proffer was a document summarizing other claims of torture by people interrogated at Area 2.

supervisor, failed to inform Dosch both of the similarity between defendant's allegations of torture and the allegations raised by Wilson, Melvin Jones, and of the actions of Burge, Pienta, and McWeeny.

### Allegations Relating to Coventry

With respect to the allegations relating to Coventry, defendant has cited no rule of law, and we are aware of none, that holds that the defendant's attorney's supervisor owes a constitutional duty to the defendant. Because defendant has failed to demonstrate that Coventry owed defendant a constitutional obligation, we must agree that the trial court properly dismissed the claims with respect to Coventry.

### Defendant's Identification of Burge as the Red-Haired Officer

As to the claims involving Dosch, defendant does not explain how Dosch's identification of Burge as the red-haired officer would have affected either the trial court's ruling on the motion or this court's decision on appeal. Notably, on direct appeal, this court held that, although the red-haired officer was a material witness, it was within the trial court's discretion not to require that the officer be called. *Patterson*, 154 Ill. 2d at 450. Defendant has failed to explain why a reasonable probability exists that, had either this court or the trial court known the identity of the red-haired officer, either court would have ruled differently. Accordingly, this claim must fail.

### Similarities Between Defendant's Allegations and Wilson's Allegations

Next, defendant claims that counsel erred by failing to inform the court of the similarities between defendant's and Wilson's torture allegations. Counsel could be ineffective for failing to introduce this evidence only if it would have been admissible at defendant's motion to suppress. Evidence is admissible if it is relevant to an is-

sue in dispute and if its prejudicial effect does not substantially outweigh its probative value. *People v. Gonzalez*, 142 Ill. 2d 481, 487 (1991). Evidence is relevant if it has any tendency to make the existence of a fact that is of consequence to the determination of the action more or less probable than it would be without the evidence. *Gonzalez*, 142 Ill. 2d at 487-88. Probability is tested in the light of logic, experience, and accepted assumption as to human behavior. *Marut v. Costello*, 34 Ill. 2d 125, 128 (1966).

In past cases, this court has declined to find evidence of prior police brutality to be relevant when the defendant offered only generalized allegations of coercive activity at Area 2 (*People v. Orange*, 168 Ill. 2d 138, 150-51 (1995)) and when the allegations of brutality were not similar and occurred three years before the case at bar (*Hobley*, 159 Ill. 2d at 312).

The appellate court has found evidence of prior brutality admissible when the allegations were similar and involved the same officers, the incidents occurred only 13 months apart, and both the prior allegations and the allegations in the case before the court contained evidence of injury consistent with police brutality. *People v. Banks*, 192 Ill. App. 3d 986, 994 (1989). The appellate court also has found evidence of prior allegations of brutality admissible where the defendant could present evidence that "the police officers who questioned him systematically tortured other suspects to obtain confessions at or near the time he was questioned." *People v. Cannon*, 293 Ill. App. 3d 634, 640 (1997). Additionally, the United States Court of Appeals, Seventh Circuit, has found evidence of prior allegations of brutality admissible when it involves the same officer, involves similar methods of torture, and occurs at or near the time of the current allegation. *Wilson v. City of Chicago*, 6 F.3d 1233, 1238 (7th Cir. 1993).

Here, the State contends that the evidence of prior allegations of torture is inadmissible because defendant has failed to demonstrate that he suffered physical injuries consistent with his allegations of torture. Although we believe that this is a relevant consideration, we do not believe that the absence of physical injury, standing alone, precludes evidence of prior acts of brutality from being admissible. See *Cannon*, 293 Ill. App. 3d at 642.

Here, defendant testified at his suppression hearing that, when he was being transported to Area 2, he was in a car with Marley, Pedersen, Pienta, and James Hill, a friend of defendant. During this trip, Pienta reached across defendant and slapped Hill across the face. After doing this, Pienta turned to defendant and stated that, if he had been the officer who had found defendant, defendant would now be dead. Later, when the officers were interrogating defendant at the police station, Pienta said to the other officers in the room, "I don't know about the rest of you, but I am tired of listening to this bullshit, I am about ready to kick his ass."

Pienta then left the room and returned with four other officers. Pienta was carrying a manila folder and a gray plastic item, later identified as a typewriter cover. Thereafter, Pienta handcuffed defendant's hands behind his back. Another officer turned off the lights, and Pienta slapped defendant across the chest and placed his hands around defendant's neck. Pedersen then grabbed the typewriter cover and placed it over defendant's face. Defendant testified that he could not breathe when the typewriter cover was over his face. Also, when the typewriter cover was over his face, the other officers hit him in the chest.

After approximately one minute, the officers removed the typewriter cover and turned the lights back on. Defendant then requested to speak to an attorney. Pienta

replied, "No, you are not getting an m.f. attorney." The officers then asked defendant if he was ready to cooperate. He told them that he had said all that he was going to say. The officers again turned the lights off and placed the typewriter cover over defendant's face. After approximately one to two minutes, the officers removed the typewriter cover and turned the lights on.

Subsequently, defendant requested something to drink, and an officer gave him a plastic cup containing a brown liquid. The officer told defendant that the cup contained bourbon. The officers then told him that he was to tell an assistant State's Attorney that he killed the victims. The officers left him alone for approximately one hour. During that time, defendant used a paper clip to scratch a statement into the bench on which he was sitting. An assistant State's Attorney then arrived with a red-haired officer, later identified as Burge. After Burge left, pursuant to defendant's request, defendant told the assistant State's Attorney that he wanted an attorney and that he had nothing to say. Thereafter, the assistant State's Attorney left. Burge then entered the room and sat across from defendant.

After taking a seat, Burge told defendant, "You are fucking up." Defendant did not respond, and Burge said, "We told you if you didn't do it—if you didn't do what we told you to do that you was going to get something worse than what you had earlier. And what you had earlier will be a snap compared to what you will get." Burge then placed his revolver on the table and asked, "[Y]ou are going to cooperate now, right?" Defendant's only reply was to request an attorney. Burge then said, "[Y]ou know, that we [sic] just doing our job and this is nothing new to you, you know, the way we go about doing things around here, you know. If you decide to tell us that, it is your word against our word. And who are they going to believe you or us." Burge then holstered his revolver and left the room.

After that, Troy entered the room and told defendant that he was going to write a statement that defendant was to sign. Defendant said that he would sign the statement if Troy allowed him to make a phone call. Troy agreed. Defendant called an attorney and his grandmother. Troy took him to the interview room and asked defendant to sign the statement. After defendant refused to sign the statement, Troy left.

McWeeny then entered the room and told defendant that he was trying to help defendant and that defendant should cooperate because "they could do something serious" to defendant if he failed to cooperate. When defendant continued to refuse to sign the statement, the officers had defendant shower and they placed him in a cell.

The allegations made by Wilson are similar in some respects to those made by defendant. Wilson has testified that he was punched, kicked, and smothered with a plastic bag. He has also claimed that he was electrically shocked and forced against a hot radiator. Additionally, Wilson has testified that Burge placed a revolver in Wilson's mouth when Burge was alone in the room with Wilson. Although both defendant and Wilson alleged that numerous officers were involved, the only officers that both included in their allegations were Burge and Pienta.

We first note that defendant's allegations and Wilson's allegations are not closely related in time. Wilson was arrested in February 1982. Defendant was arrested in April 1986. Thus, more than four years passed between the two occurrences. We recognize, however, that both defendant and Wilson alleged that they had been punched, kicked, and suffocated with a plastic bag. Moreover, Burge, while alone with each of them, used a revolver as a threat.

Notwithstanding these similarities, we do not believe that a reasonable probability exists that, had defense counsel informed the trial court of these similarities, the

trial court would have found this evidence admissible or that we would have reversed this decision on appeal. As noted earlier, the Wilson incident occurred more than four years before the incident involving defendant. Additionally, at the time of defendant's trial, Wilson believed that he was tortured not because officers at Area 2 routinely tortured *all* suspects, but rather because the officers routinely tortured those accused of killing police officers. See *Wilson*, 6 F.3d at 1236.

Because the information available at the time indicated that Wilson was mistreated for a reason wholly unrelated to defendant's case, and because the evidence identified only a single incident of misconduct removed in time from defendant's, we believe that the evidence is too attenuated to be relevant. Accordingly defendant's attorney was not ineffective for failing to inform the court of the similarities between defendant's and Wilson's torture allegations.

### Failure to Introduce Plaintiff's Proffer

Defendant next contends that his attorney was ineffective for failing to document the other allegations of torture by introducing the proffer prepared by Wilson's civil attorneys. The proffer is a 12-page document detailing various allegations of torture by Burge and his associates during the years 1972 through 1984. In his affidavit, Dosch admits that he had the proffer before he sought to reopen defendant's motion to suppress.

After examining the proffer, we do not believe that defense counsel was ineffective for failing to provide it to the trial court. The proffer is a summary of evidence prepared by Wilson's civil attorneys for Wilson's civil trials. We have previously recognized that documents prepared in anticipation of litigation "generally lack the earmarks of trustworthiness and reliability." *People v. Smith*, 141 Ill. 2d 40, 73 (1990); see also 725 ILCS 5/115—5(c)(2) (West 1998). The plaintiff's proffer is nothing more than

12 pages of unreliable hearsay. Consequently, we are unable to conclude that, even if this proffer had been presented to the trial court, a reasonable probability exists that the court would have either reopened the hearing or suppressed defendant's statements.

### Failure to Subpoena Burge's OPS Records

Defendant next contends that his attorney was ineffective for failing to subpoena Burge's OPS records. Defendant, however, never explains what information was contained within Burge's OPS records that would have assisted him in convincing the trial court to reopen the hearing on the motion to suppress or to grant defendant's motion. Without this information, we have no basis to conclude that a reasonable probability exists that, had defense counsel subpoenaed the records, the result of the proceeding would have been different.

### *Failure to Introduce at Trial Evidence That Defendant's Confession Was Coerced*

Defendant next contends that his attorney was ineffective for failing to introduce evidence that his confession was coerced. Defendant contends that this error was particularly damaging because, during opening statements, defense counsel promised to present evidence that defendant's statement was coerced.

Defendant could have raised this issue on direct appeal. Because he failed to do so, the issue is waived. See *People v. Hobley*, 182 Ill. 2d 404, 428 (1998). Defendant also argues, however, that his appellate counsel was ineffective for failing to raise this issue on direct appeal. Consequently, we will review the underlying claim. See *People v. West*, 187 Ill. 2d 418, 435 (1999).

Dosch's affidavit reveals that he chose not to have defendant testify that his confession was coerced or to present other evidence to corroborate defendant's torture allegations because he believed that reversible error had

occurred earlier during the trial when one of the State's witnesses, in violation of *Doyle v. Ohio*, 426 U.S. 610, 49 L. Ed. 2d 91, 96 S. Ct. 2240 (1976), commented on defendant's post-arrest silence. Unfortunately for defendant, this court did not agree with counsel's assessment of the *Doyle* violation. Although this court agreed that a *Doyle* violation had occurred, the court held that the error was harmless beyond a reasonable doubt. *Patterson*, 154 Ill. 2d at 467-68.

We recognize that a mistake as to the law can be a basis for finding that an attorney was ineffective. See *People v. Wright*, 111 Ill. 2d 18 (1986) (holding that an attorney was ineffective for failing to pursue a voluntary intoxication defense because he did not understand the elements). Here, however, counsel's error lies not in believing that the State had committed reversible error, but rather in deciding that, because of the error, he should not present the defense that he had promised to present.

Significantly, neither the State nor Dosch has ever explained what about the *Doyle* violation would have made defendant's testimony less credible than it would have been had the *Doyle* violation not occurred. Because the *Doyle* violation did not undermine, in any manner, defendant's defense, we fail to understand what about this *Doyle* violation would lead a reasonable attorney to conclude that he need not present the defense that he has already promised the jury that he will present. We also fail to see what strategy would lead Dosch to conclude that it would be best to pin defendant's chance for success on the possibility of a reversal and remandment for a new trial rather than attempting to obtain an acquittal. Consequently, we believe that defendant has pleaded sufficient facts to demonstrate that counsel's decision not to present this defense fell below an objective standard of reasonableness.

We now decide whether this failure to present a defense prejudiced defendant. As noted above, to demonstrate prejudice, a defendant must show that there is a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different. *Strickland*, 466 U.S. at 695, 80 L. Ed. 2d at 698, 104 S. Ct. at 2068-69. Notably, this standard does not require a defendant to demonstrate that counsel's conduct more likely than not altered the outcome in the case. *Strickland*, 466 U.S. at 693, 80 L. Ed. 2d at 697, 104 S. Ct. at 2068. Instead, a reasonable probability "is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694, 80 L. Ed. 2d at 698, 104 S. Ct. at 2068.

The evidence identifying defendant as the perpetrator consisted of (1) the oft-changing testimony of a teenager whose cousin had been a suspect in the crime; and (2) the testimony from the police officers and assistant State's Attorneys concerning defendant's confession.

The promised defense would have consisted of defendant's testimony consistent with the testimony he provided at the motion to suppress. In his brief, defendant also contends that he could have introduced other evidence corroborating this testimony. The State raises numerous objections to this other testimony. Without deciding the effect of the other testimony, we believe that defendant has pleaded sufficient facts to undermine confidence in the jury's verdict.

The evidence against defendant consisted essentially of the testimony of police officers and assistant State's Attorneys stating that defendant had confessed. During opening statements, defendant's attorney told the jury that they would hear evidence that defendant confessed only because the police beat him up and tried to suffocate him with a plastic bag. Notwithstanding this

promise, defense counsel chose to present no such evidence. Although we are unable to conclude that, absent this failure, the result of the proceeding *would* have been different, we have no need to reach such a conclusion. See *Strickland*, 466 U.S. at 695, 80 L. Ed. 2d at 698, 104 S. Ct. at 2068. We need only determine that a *reasonable probability* exists that, had the evidence been present, the outcome would have been different. *Strickland*, 466 U.S. at 695, 80 L. Ed. 2d at 698, 104 S. Ct. at 2068-69. We are, of course, unable to divine the course the jury would have taken if it had heard this evidence, but we believe that, under the factual circumstances of this case, the evidence is of such import that our confidence in the jury's verdict is undermined.

In reaching this conclusion, we emphasize that we are determining only that defendant has pleaded sufficient facts to enable him to obtain an evidentiary hearing. After the hearing, the trial court may conclude that defendant had demonstrated that his attorney was ineffective. On the other hand, the trial court may determine that the attorney had a previously undisclosed but objectively reasonable basis for failing to present defendant's testimony or that defendant's testimony is not so compelling as to undermine confidence in the jury's verdict. That, however, is a question to be answered in the trial court.

### Failure of Post-Trial Counsel to Present Newly Discovered Evidence of Torture Allegations

Following defendant's conviction, Dosch sought to continue the date for filing a post-trial motion until after the trial transcripts were completed. The trial court denied the motion, and Dosch failed to file a post-judgment motion. Subsequently, this court remanded the action for the filing of a post-trial motion. Thereafter, in an arrangement with the office of the State Appellate Defender, Joan Kubalanza, an attorney with Foley &

Lardner who normally handled commercial litigation, assumed primary responsibility for handling defendant's post-trial motion and appeal.

Defendant now contends that, before Kubalanza filed her motion, she knew that (1) Burge was the red-haired officer; (2) a federal jury had found a policy and practice of torture and abuse by Area 2 detectives; and (3) the City of Chicago had held public hearings at which acts of torture and abuse by Burge had been detailed. Defendant also claims that Kubalanza had access to (1) trial counsel's file containing Wilson's proffer and information concerning Caine and Arbuckle, who could corroborate defendant's testimony; (2) an article from the Chicago Reader documenting torture by Burge and other Area 2 detectives; and (3) an OPS report finding that physical and psychological abuse was systemic and methodical in Area 2 from 1973 through 1986. Defendant asserts that, if Kubalanza had introduced this new evidence, the trial court would have granted defendant's motion for a new trial.

For new evidence to be sufficient to grant a defendant a new trial, the evidence (1) must be of such conclusive character that it will probably change the result on retrial; (2) must be material but not merely cumulative; and (3) must have been discovered since trial and be of such character that the defendant in the exercise of due diligence could not have discovered it earlier. *People v. Molstad*, 101 Ill. 2d 128, 134 (1984). Because defendant's claim is based upon a claim of ineffective assistance of counsel, he must demonstrate that Kubalanza's failure to introduce this evidence fell below an objective standard of reasonableness and that, but for counsel's error, a reasonable probability exists that the result of the proceeding would have been different. See *Strickland*, 466 U.S. at 695, 80 L. Ed. 2d at 698, 104 S. Ct. at 2068-69.

Turning to the facts that defendant contends Kubalanza should have introduced, we can easily discard some of them. The fact that Burge was the red-haired officer and the facts contained within trial counsel's file were facts that were not "new." Not only *could* they have reasonably been discovered earlier, they *were*. The article from the Chicago Reader is simply a newspaper article, and as such is essentially a collection of hearsay statements. Defendant fails to explain why this hearsay would have been admissible for any purpose. With respect to the hearings, defendant does not explain what information was revealed at those hearings that would have required the trial court to order a new trial.

Turning to the OPS report, we note that defendant concedes that the report was not public at the time Kubalanza filed defendant's post-trial motion. Defendant contends, however, that the report could have been obtained by subpoena. Defendant, however, never explains why Kubalanza should have known that the OPS report existed. Without some explanation of why Kubalanza should have known that the OPS report existed, we will not find that Kubalanza's actions fell below an objective standard of reasonableness. Kubalanza could not reasonably have been expected to engage in a fishing expedition by serving subpoenas on the Chicago police department. This is particularly true given that, just before defendant's trial, Dosch had subpoenaed records from the OPS and the trial court found that the records that OPS delivered were not relevant to the litigation.

That leaves only the fact that a federal jury had found that Area 2 detectives had a policy and practice of torture and abuse. The evidence defendant relies on here is from the first Wilson civil trial. In that case, the jury found that Wilson's civil rights were violated. However, the jury also exonerated all of the individual officers, includ-

ing Burge. Moreover, the finding with respect to the policy and practice of abuse was a finding that "the City of Chicago had a *de facto* policy authorizing its police officers physically to abuse persons suspected of *having killed or injured a police officer.*" (Emphasis added.) *Wilson,* 6 F.3d at 1236.

After examining this evidence, we are unable to conclude that a reasonable probability exists that, had Kubalanza presented this in defendant's post-trial motion, the trial court would have concluded that the evidence was of such character that it would likely change the result on retrial. First, the jury verdict implicated no officer at all, let alone any officer identified by defendant. Second, the jury's finding, and Wilson's theory of the case, was that Area 2 detectives tortured defendants that they believed had killed or injured police officers. Here, the victims were not police officers. Thus, any probative value that the jury's verdict in the Wilson case might have is weakened to the point of irrelevancy. Consequently, we are unable to conclude that Kubalanza rendered the ineffective assistance of counsel when she prepared and presented defendant's post-trial motion.

*Failure of Appellate Counsel to Supplement the Record on Direct Appeal or Seek a Remand*

Defendant next contends that Kubalanza was ineffective when she represented him on appeal. Specifically, he alleges that, by the time she filed his appellate brief, she (1) had obtained the OPS report finding a systemic pattern and practice of torture at Area 2; (2) had obtained an OPS report finding that Burge had tortured Wilson and recommending that Burge be fired; and (3) knew that the police board was holding public hearings at which Shadeed Mumin, Wilson, and Melvin Jones testified about acts of torture that "closely paralleled" the acts described by defendant. Defendant contends that Kubalanza should have either sought to supplement the

record with this information or sought a remand to the trial court for a hearing on these issues.

Supreme Court Rule 329 (134 Ill. 2d R. 329) permits a party to amend the record on appeal to correct "[m]aterial omissions," "inaccuracies," or "improper authentication." Rule 329 is not a vehicle through which a party may supplement a record with evidence that was not presented in the lower court. *People v. Evans*, 125 Ill. 2d 50, 94 (1988). Because the evidence defendant now relies upon was not presented in the lower court, no reasonable probability exists that, had a motion to supplement been made, that it would have been granted.

Turning to defendant's assertion that Kubalanza should have filed a motion for remand, we are unable to conclude that Kubalanza's failure to file such a motion fell below an objective standard of reasonableness. Although such a motion is not necessarily improper, defendant has not identified a single statute, court rule, or case that authorizes such a motion. Because of this, we are unable to conclude that Kubalanza's failure to file the motion was objectively unreasonable.

### Failure to Interview Other Witnesses

Defendant next contends that his trial attorneys were ineffective for failing to interview and present witnesses that were identified in the police and medical examiner's reports. These witnesses included Ophelia Loy, Willie Washington, Mack Ray, and Rowland.

The State contends that, because the issue could have been raised on direct appeal, defendant has waived his claim that counsel was ineffective for failing to interview Loy. See *Hobley*, 182 Ill. 2d at 428. Although this is true, defendant argues that his appellate counsel was ineffective for failing to raise this issue on direct appeal. Consequently, we will review the underlying claim. See *West*, 187 Ill. 2d at 435.

Defendant contends that Loy's testimony would have

impeached the reliability of the unsigned statement admitted against him. Loy, the victims' neighbor, reportedly saw one of the victims raking grass on April 18, 1986, at 3 p.m. In defendant's statement, however, he states that he killed the victims during the early morning hours of April 18.

The State asserts that defense counsel did not have Loy testify as a matter of trial strategy because her testimony would have directly contradicted defendant's theory as to the victims' time of death. After reviewing the evidence, we agree with the State's assessment. During trial, defense counsel sought to establish that the victims had died *before* the time mentioned in defendant's confession. Loy, however, would have testified that the victims died *after* the time indicated in defendant's confession. Because Loy's testimony would have directly contradicted defendant's theory relating to the time of death, we believe that counsel's decision not to call Loy was a matter of trial strategy and did not fall below an objective standard of reasonableness.

Defendant next asserts that his attorneys should have interviewed Willie Washington because he was a suspect in the Sanchez murders, he was identified in police reports as the person who killed the Sanchezes, and his brother Wayne knew the victims and discovered the bodies. Defendant contends that, if counsel had interviewed Washington, he would have learned that Washington lived near the victims and that the victims would open the door for him.

Defendant also contends that defense counsel should have interviewed Ray, who was reported in a police report to have told the police that Willie Washington had recruited him to rob the Sanchezes. According to Ray's affidavit, if defense counsel had interviewed him, counsel would have learned that Ray, along with Willie and Wayne Washington, stole merchandise to sell to the

Sanchezes. On several occasions, the Washington brothers asked Ray if he wanted to help them rob the Sanchezes. Ray declined each time.

Defendant also contends that counsel was ineffective for failing to interview Rowland. Defendant asserts that counsel should have interviewed Rowland because police reports indicate that defendant was at Rowland's house just before the murders. Moreover, Rowland told Madigan that Ray had told him that Willie Washington had tried to recruit Ray to rob the Sanchezes and that defendant was with his girlfriend at the time of the murders.

The State first argues that defendant has waived his right to challenge counsel's failure to interview and present the testimony of Washington, Ray, and Rowland. We must disagree. The evidentiary basis of the claims relating to these witnesses necessarily rests upon evidence that was *de hors* the direct appeal record. See *People v. Whitehead*, 169 Ill. 2d 355, 372 (1996). Here, Ray and Rowland have provided affidavits as to what their testimony would have been, and one of defendant's attorneys who interviewed Washington in prison has filed an affidavit revealing what Washington told him during the interview.

After examining the affidavits, we are unable to conclude that defendant has demonstrated that, had he introduced this testimony, a reasonable probability exists that he would have been found not guilty. Ray, an admitted drug user who was in custody on a burglary charge, would have been able to testify only that the Washingtons had asked him if he wanted to rob the Sanchezes. Ray had no information that either or both Washington brothers actually had committed the crime, and he was unable to identify with any specificity the time when they suggested robbing the Sanchezes. Rowland's testimony is nothing more than hearsay that repeats Ray's vague testimony. Finally, the information provided by

Washington adds nothing of substance. After reviewing these affidavits, we are unable to conclude that, had counsel interviewed these witnesses and presented this evidence, a reasonable probability exists that the outcome of the trial would have been different.

### Failure to Cross-Examine Witnesses Properly

Defendant next asserts that his attorney was ineffective for failing to cross-examine Hall properly. In particular, he asserts that counsel failed to perfect impeachment relating to (1) where Hall saw the shotgun defendant tried to sell her; and (2) what day defendant tried to sell her the shotgun.

The crux of defendant's argument concerns counsel's failure to impeach Hall with her testimony before the grand jury. Defendant, however, did not attach Hall's grand jury testimony to his post-conviction petition. Without this evidence attached to his petition, defendant's claim must fail. See 725 ILCS 5/122—2 (West 1998); *People v. Turner*, 187 Ill. 2d 406, 414 (1999).

The other issues defendant raises all involve a failure to cross-examine or perfect impeachment with respect to certain police reports. Defendant does not assert that these records were *de hors* the record on direct appeal. Consequently, we find these issues waived. See *Hobley*, 182 Ill. 2d at 428; *Whitehead*, 169 Ill. 2d at 372.

### Failure to Seek Removal of Judge Cieslik for Cause

Defendant asserts that defense counsel was ineffective for failing to seek removal of Judge Cieslik for cause and that appellate counsel was ineffective for failing to raise this issue on appeal.

Defendant's action was originally assigned to Judge Bailey. Defendant's attorney, Thomas Bomba, sought a substitution as a matter of right (see 725 ILCS 5/114—5(a) (West 1998)). When that motion was granted, Judge Bailey, rather than sending the case to the office of the

chief judge for random reassignment, assigned the case to Judge Cieslik. Bomba moved to vacate the case assignment, and Judge Cieslik denied that motion. Subsequently, defendant sought leave to file a petition for writ of *mandamus* or a supervisory order with this court. This court denied defendant's motion.

Defendant could have raised this issue on direct appeal. Because he failed to do so, the issue is waived. *Hobley*, 182 Ill. 2d at 428. Defendant argues, however, that his appellate counsel was ineffective for failing to raise this issue on direct appeal. Consequently, we will review the underlying claim. See *West*, 187 Ill. 2d at 435.

A defendant who seeks a substitution of judge for cause (see 725 ILCS 5/114—5(d) (West 1998)) bears the burden of establishing actual prejudice. *People v. Vance*, 76 Ill. 2d 171, 178 (1979). To meet this burden, the defendant must establish "animosity, hostility, ill will, or distrust towards this defendant." *Vance*, 76 Ill. 2d at 181.

Defendant contends that Judge Cieslik demonstrated his prejudice when he (1) ruled against the motion to vacate the case assignment to Judge Cieslik filed by Bomba; (2) criticized defendant's attitude; (3) criticized defendant's objections to Neil Spector, who had been appointed to represent defendant; (4) referred to Hicks, in a different case, as "Smiley" and to another assistant public defender as "Laughing Boy"; (5) had a reputation for racial and sexual intolerance and had previously been censured for offensive comments to a female attorney; (6) made derogatory comments to both defendant and Hicks during the motion to suppress; and (7) stated, during defendant's testimony during the motion to suppress, that he was not getting the facts from defendant.

The facts that Judge Cieslik ruled against defendant's motion to vacate the case assignment and that he told Bomba that the motion was baseless are not reasons to grant a motion for substitution for cause. See *Vance*, 76

Ill. 2d at 178 (holding that the fact that a judge had ruled against the defendant is not a basis for finding the judge prejudiced); see also *Liteky v. United States*, 510 U.S. 540, 555, 127 L. Ed. 2d 474, 490, 114 S. Ct. 1147, 1157 (1994) (explaining that "judicial rulings alone almost never constitute a valid basis for a bias or partiality motion").

The comments criticizing defendant's attitude and defendant's objections to Spector similarly do not demonstrate an animosity, hostility, ill will, or distrust toward defendant. The first complained-of criticism occurred during the following colloquy.

"THE COURT: Any other matters that can be handled at this particular time?

A DEFENDANT:[3] Did they catch the guy who did the double murder yet?

THE COURT: I don't know anything about it sir. I really have no idea who they caught or anything. I have enough problems with the people that are before me, and I don't want to get involved with some other people's problems.

I not only have problems with the individuals, but certain other situations that you need not concern yourself.

The only problem I have, gentlemen, is that you all get a fair trial and you get fair consideration by this court, do you understand that?

A DEFENDANT: I understand, I'm just wondering is anybody earning their money around here besides sitting on your duffs.

THE COURT: How do you mean that?

A DEFENDANT: You got me up here for a double murder I didn't even do.

THE COURT: Look, I know nothing about what's happening in here. An attitude like that will do nothing for you."

---

[3]Although defendant ascribes these statements to himself, the record does not reveal whether defendant or a codefendant was the speaker. For purposes of this appeal, we will accept defendant's representation that he was the speaker.

Defendant also complains of Judge Cieslik's comments during a later proceeding in which defendant said, with respect to Spector, "He's not representing me, your Honor, I don't want him." The trial judge responded,

"When did you think that you could tell me—just a minute. You listen to me. I listened to what you had to say. You are not going to tell me who's going to represent you. Do you understand that? I am not running a courtroom where the defendants are telling me what they are going to do. There is no law that requires me to listen to you to tell me what I have to do. Do you understand that? I don't tell you what you have to do. You are required to do certain things as required by rules of court and rules of statute or the Supreme Court. But there is [sic] no rules that I know of where a defendant can come out there and tell me that a particular individual is not representing him. You can indicate that you are not satisfied with him, and it is for me to make that decision."

After reviewing the statements in their context, we are unable to conclude that they demonstrate animosity, hostility, ill will, or distrust toward defendant. Instead, they demonstrate nothing more than judicial expressions of impatience, dissatisfaction and annoyance that are within the bounds of what judges, as imperfect people, sometimes display, and such statements do not provide a basis for finding that Judge Cieslik was prejudiced against defendant. See *Liteky*, 510 U.S. at 555-56, 127 L. Ed. 2d at 491, 114 S. Ct. at 1157; see also *People v. Blanck*, 263 Ill. App. 3d 224, 232-33 (1994) (holding that an isolated comment made during a "momentary lapse of judicial composure" does not demonstrate the prejudice necessary to obtain a motion for substitution for cause).

Although we recognize the concern raised by Judge Cieslik's statements in another case involving Hicks and another African-American assistant public defender, we do not believe that these statements are sufficient to demonstrate a prejudice against defendant. To begin with, the comments at issue were not directed at defen-

dant. Granted, they were directed toward one of defendant's attorneys, but our test looks to whether the trial court is prejudiced against the defendant. See *Vance*, 76 Ill. 2d at 181. Although situations may arise in which comments directed toward a defendant's attorney can demonstrate animosity, hostility, ill will, or distrust toward the defendant, we do not believe that this single comment in another proceeding is sufficient to meet this standard. Moreover, the mere fact that Judge Cieslik allegedly had a reputation for racial and sexual intolerance is an insufficient basis upon which to grant a motion for substitution for cause. "To conclude that a judge is disqualified because of prejudice is not, of course, a judgment to be lightly made." *Vance*, 76 Ill. 2d at 179. Because of this, a defendant must demonstrate actual prejudice, not just the possibility of prejudice. *People v. Hooper*, 133 Ill. 2d 469, 513 (1989).

Finally, the comments directed toward defendant and his attorney during the motion to suppress do not demonstrate animosity, hostility, ill will, or distrust toward defendant. Defendant alleges that Judge Cieslik admonished him 11 times during defendant's testimony to answer yes or no. Although the judge did, at times, instruct defendant to answer yes or no, he did so only where there was confusion over the question asked or when an objection had been raised. With respect to the statement in which Judge Cieslik stated, "I know what the facts are. But that is not the facts [*sic*] I am getting from this witness," it appears that the judge's comment arose, not as a criticism of defendant, but rather from confusion over the contents of defendant's testimony.

After reviewing the portions of the record cited by defendant, we are unable to conclude that, had a motion for substitution for cause been filed, a reasonable probability exists that it would have been granted.

### Failure to Argue That the Trial Court Asked
### Improper *Witherspoon* Questions

Defendant contends that, despite repeated objections from Dosch, the trial court failed to ask proper *Witherspoon* questions. Defendant now asserts that his counsel on direct appeal was ineffective for failing to raise this issue.

We note that the State begins its argument by asserting that this claim is waived because it "should have been fully addressed on direct appeal." With all due respect to the State, this is precisely defendant's argument.

*Witherspoon v. Illinois*, 391 U.S. 510, 20 L. Ed. 2d 776, 88 S. Ct. 1770 (1968), precludes the trial court from excluding for cause jurors who merely express general objections to the death penalty or conscientious or religious scruples against its infliction. For a juror to be excluded for cause because of his views on the death penalty, the juror's views must "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." *Adams v. Texas*, 448 U.S. 38, 45, 65 L. Ed. 2d 581, 589, 100 S. Ct. 2521, 2526 (1980).

The crux of defendant's argument is that the trial court failed to inquire of those jurors dismissed for cause whether they could set aside their objections to the death penalty and follow the law and impose the death penalty if the circumstances warranted it. After reviewing the relevant portions of the record, we believe that the trial court's *voir dire* with respect to this issue did not violate *Witherspoon*.

At the beginning of *voir dire*, the trial court instructed the *venire*:

"*Keeping in mind what I told you about your duty to follow the law* and what I just told you about now, is there anyone in the array who unmistakably would automatically vote against the imposition of the death penalty without regard to any evidence that might be developed at trial of the case ***." (Emphasis added.)

Nine prospective jurors raised their hands. Ultimately only three of those were excused because of their views on the death penalty. The trial court asked each of these prospective jurors several questions about their views on the death penalty and their ability to impose it. Further the court ended each inquiry with the question "Is there no situation regardless of how brutal or how heinous where you could vote for capital punishment?" One prospective juror answered, "No, no situation." A second prospective juror answered. "No, I couldn't." And the third prospective juror answered, "No."

Given the trial court's admonition regarding the jurors' duty to follow the law and these prospective jurors' unequivocal statements that they could never vote to impose the death penalty, the trial court was not required to conduct a further examination. Consequently, had appellate counsel raised this issue on direct review, no reasonable probability exists that this court would have found a *Witherspoon* violation.

*Failure to Object to the Use of Residential Burglary as an Eligibility and Aggravating Factor*

Defendant next contends that his counsel was ineffective during the sentencing hearing because counsel failed to object to the State's use of residential burglary during the eligibility phase as an aggravating factor rendering defendant eligible for the death penalty. When defendant was sentenced, residential burglary was not one of the enumerated felonies making a defendant eligible for a death sentence. See Ill. Rev. Stat. 1985, ch. 38, par. 9—1(b)(6)(c) (now codified, as amended, at 720 ILCS 5/9—1(b)(6)(c) (West 1998)). Defendant also contends that counsel was ineffective in not objecting to the use of the residential burglary conviction as an aggravating factor during the aggravation/mitigation phase. Finally, defendant asserts that appellate counsel was ineffective for failing to raise this issue on appeal.

We can easily reject defendant's assertion with respect to the use of residential burglary as an aggravating factor during the eligibility phase. At the conclusion of the eligibility phase, the jury returned two verdicts: one found defendant eligible for the death penalty based on multiple murders (see Ill. Rev. Stat. 1985, ch. 38, par. 9—1(b)(3) (now 720 ILCS 5/9—1(b)(3) (West 1998))), the other found defendant eligible for the death penalty because the murders occurred during a home invasion or residential burglary (see Ill. Rev. Stat. 1985, ch. 38, par. 9—1(b)(6)(c) (now codified, as amended, at 720 ILCS 5/9—1(b)(6)(c) (West 1998))). Defendant raises no challenge to the jury's finding with respect to his eligibility for the death penalty based upon multiple murders. The law is well established that, where a defendant is found eligible for the death penalty based upon two or more aggravating factors, the fact that one of those factors may later be found improper does not affect the separate valid aggravating factor. *People v. Macri*, 185 Ill. 2d 1, 58 (1998). Because the eligibility factor based upon multiple murders remains valid, even if appellate counsel had raised this issue on direct appeal, no reasonable probability exists that this court would have found that the outcome of the proceeding would have been different if trial counsel had objected to this use of the residential burglary conviction.

Turning to the other facet of defendant's argument, we see no ineffectiveness in not objecting to the State's use of defendant's conviction of residential burglary as an aggravating factor during the aggravation-mitigation stage. Because evidence of a defendant's prior crimes is admissible, as an aggravating factor (*People v. Hope*, 168 Ill. 2d 1, 41-42 (1995)), no reasonable probability exists that, had appellate counsel raised this issue on direct appeal, this court would have found that trial counsel was ineffective.

### Failure to Object to the Trial Court's
### Praise of the Jury

Defendant next asserts that trial counsel was ineffective for failing to object and move for a mistrial after the trial court praised the jury following the jury's finding defendant guilty. Defendant also contends that appellate counsel was ineffective for failing to raise this issue on direct appeal.

After the jury returned verdicts finding defendant guilty, the trial court, responding to an earlier request of the jury, told the jurors that they could begin hearing evidence for defendant's sentencing hearing the next day. Before dismissing the jurors, the court stated, "I think you have certainly done a great job. You've been very diligent and we will see you tomorrow."

A trial court has the duty to refrain from conveying improper impressions to the jury. *People v. Brown*, 172 Ill. 2d 1, 38 (1996). For such comments to be reversible error, the defendant must demonstrate that the comments constituted a material factor in the jury's decision. *Brown*, 172 Ill. 2d at 38-39.

Here, we do not believe that the trial court's comment was intended as a praise of the jury's guilty verdict. The context of the statement reveals that the trial court was expressing its gratitude to the jury for deliberating for several hours and for performing its job. Given this context, and the substantial amount of aggravating evidence presented during the sentencing hearing, even if appellate counsel had raised this issue on appeal, no reasonable probability exists that this court would have found trial counsel ineffective for failing to object or seek a mistrial.

### New Evidence Supporting Defendant's Claim
### That He Was Tortured

Defendant next asserts that he is entitled to an evidentiary hearing to present new evidence to support his

claim that his confession was the result of torture. Defendant's new evidence falls into four categories: (1) the OPS report finding that "psychological techniques and planned torture" were "systemic" and "methodical" in Area 2 and that Burge actively participated in and supervised this torture; (2) appellate court decisions holding that Burge tortured Wilson and that Burge was properly fired for his role in torturing Wilson; (3) the discovery of 60 additional acts of torture from Area 2; and (4) the conclusion, by an expert on the psychological effects of torture, that defendant was tortured.

On direct review, this court addressed the voluntariness of defendant's confession and held that the trial court did not err in finding defendant's confession voluntary. See *Patterson*, 154 Ill. 2d at 445-47. Consequently, defendant's claim is barred by *res judicata*. See *Hobley*, 182 Ill. 2d at 449. We have recognized, however, that, in the interests of fundamental fairness, the doctrine of *res judicata* can be relaxed if the defendant presents substantial new evidence. See *Hobley*, 182 Ill. 2d at 449; *People v. Madej*, 177 Ill. 2d 116, 132 (1997); see also *People v. Evans*, 186 Ill. 2d 83, 91 (1999).

For new evidence to be sufficient to warrant a new trial, it must be of such conclusive character that it will probably change the result upon retrial. *Hobley*, 182 Ill. 2d at 449; see also *Molstad*, 101 Ill. 2d at 134. Furthermore, the evidence must be material and not merely cumulative, and " 'it must have been discovered since the trial and be of such character that it could not have been discovered prior to trial by the exercise of due diligence.' " *Molstad*, 101 Ill. 2d at 134, quoting *People v. Baker*, 16 Ill. 2d 364, 374 (1959).

We will first address the "newness" of defendant's new evidence. The OPS report clearly qualifies as new evidence, as it did not exist until after defendant's trial. The same rationale applies to the appellate court opinions upon which defendant relies.

The same rationale, however, does not apply to all of the 60 other cases involving torture at Area 2. The record clearly establishes that defendant's counsel obtained a copy of the plaintiff's proffer before counsel sought to reopen defendant's motion to suppress. Thus, it would appear that any torture claims that were detailed in plaintiff's proffer should not be considered new evidence. We do not believe such a simplistic approach to be appropriate, however. Many of the claims detailed in the plaintiff's proffer are remote in time from defendant's claims. The amount of time separating the incidents is a relevant consideration when determining admissibility. See *Hobley*, 159 Ill. 2d at 312; *Banks*, 192 Ill. App. 3d at 994; see also *Wilson*, 6 F.3d at 1238. Even incidents that are remote in time can become relevant, however, if the party presenting the evidence can present evidence of other incidents that occurred in the interim. Thus, a single incident years removed has little relevance. However, a series of incidents spanning several years can be relevant to establishing a claim of a pattern and practice of torture. Consequently, we believe that the claims detailed in the proffer should be considered new evidence, but only if defendant can establish the later discovery of other torture allegations linking defendant's claims to those contained in the proffer.

With respect to the report of defendant's expert on the psychological effects of torture, this is clearly an examination that, in the exercise of due diligence, could have been completed before defendant's trial. Significantly, the expert's conclusions do not rest on any evidence that was not available before defendant's trial. Consequently, we are unable to conclude that the expert's opinion constitutes new evidence.

We now examine the new evidence to determine its materiality and whether it is of such a substantial character that it would probably change the result on retrial.

The first item is the OPS report. The OPS report is actually two reports. The first, the Goldston report, concerns the "history of allegations of misconduct by area two personnel." The second, the Sanders report, is an "analysis of the *Wilson* case." The Goldston report answered two specific questions: (1) "Is there evidence that personnel assigned to Area 2 are guilty as regards the practice of systemic abuse of individuals in their custody?" and (2) "If such systemic abuse did occur, is there evidence that Area 2 command personnel were aware of such abuse and condoned the same?"

With respect to the first question, the Goldston report concludes that "abuse did occur and that it was systemic." The report also explains that the abuse "was not limited to the usual beating, but went into such esoteric areas as psychological techniques and planned torture." With respect to the second question, the report concludes that "[p]articular command members were aware of the systemic abuse and perpetuated it either by actively participating in same or failing to take any action to bring it to an end."

The data supporting the Goldston report identify 13 other incidents of the use of a plastic bag or a typewriter cover to suffocate the victims and 11 incidents in which a firearm was used to threaten or strike the victim. Of the incidents in which specific police officers were identified, Burge was identified in 51% of the cases. He was also alleged to have had some contact with at least two of the other cases as well.

The Sanders report finds, *inter alia*, that Burge actively participated in the "mistreatment" of Wilson, burned Wilson with a radiator, repeatedly shocked him, and "engaged Andrew Wilson in several unjustified physical altercations during which Mr. Wilson was handcuffed and incapable of providing any resistance."

Defendant also relies upon two appellate court

opinions, one federal and one state. The federal opinion holds that a rational jury could have found from the "frequency of the abuse, the number of officers involved in the torture of Wilson, and the number of complaints from the black community" that the superintendent of police knew that officers in Area 2 were "prone to beat up suspected cop killers." *Wilson*, 6 F.3d at 1240. Additionally, the court held that evidence of similar acts of torture were relevant to the question of whether the officers tortured Wilson. *Wilson*, 6 F.3d at 1238.

The state opinion is an unpublished appellate court decision in which the court affirmed the decision to fire Burge and to suspend two other officers for their roles in torturing Wilson. *O'Hara v. Police Board*, Nos. 1—94—0999, 1—94—2462, 1—94—2475 cons. (1995) (unpublished order under Supreme Court Rule 23). In particular, defendant explains that the circuit court had held that the police board did not err in hearing evidence from Jones and Mumin relating to the abuse they suffered while arrestees at Area 2. He then notes that the appellate court affirmed the trial court's decision.

The final new evidence that defendant relies upon are the numerous other allegations of torture that defendant's attorney has discovered. Defendant asserts that his counsel has discovered 60 cases of torture and abuse that Burge either participated in or supervised. He explains that Burge directly participated in 27 of these cases. Of these 27, 11 involved suffocation by plastic bag or typewriter cover, 6 involved threats with a gun, and 23 involved beatings. Of the cases supervised by Burge, 14 involved suffocation, 2 involved threats with a gun, and 29 involved beatings. Pienta was identified in five cases. Three of those involved suffocation and three involved beatings. Eight cases involved McWeeney, who was usually identified as an officer who appeared to take a statement from the victim after the torture had been

completed. Finally, four cases implicated Madigan and three implicated Pedersen.

The State does not directly challenge the accuracy of defendant's information. Instead, the State argues that, because defendant did not suffer a physical injury, evidence of other allegations of beatings is inadmissible. Indeed, the State boldly asserts that "[t]his court has consistently required a showing of physical injury in order to admit evidence of other allegations of police brutality." The State supports this statement by citing to eight different decisions. A review of these decisions, however, reveals that they do not support the State's assertion.

Two of the cases relied upon by the State do not even address the admissibility of other allegations of police brutality. Instead, they confine their analysis to the question of whether the defendant demonstrated that he suffered injury at the hands of the police and what effect that has. See *People v. Woods*, 184 Ill. 2d 130 (1998); *People v. Wilson*, 116 Ill. 2d 29 (1987). In three cases, this court rejected the other evidence because it consisted of only generalized allegations of coercive activity. See *Orange*, 168 Ill. 2d at 150-51; *People v. Mahaffey*, 165 Ill. 2d 445, 464 (1995); *People v. Jones*, 156 Ill. 2d 225, 245 (1993). One case involved a defendant who asserted that the police had injured him, but the evidence offered by the defendant did not support his assertions. Because the defendant's facts did not support his own claims, the other allegations of brutality were irrelevant. See *People v. Maxwell*, 173 Ill. 2d 102, 120-21 (1996).

That leaves, as the State's final two cases upon which it relies, this court's decisions in the direct and postconviction appeals of Madison Hobley. Neither of these cases, however, supports the State's position. In Hobley's direct appeal, the defendant relied upon *Banks* and asserted that evidence of prior allegations of police brutality should be admissible. This court rejected his claim,

not because he failed to demonstrate a physical injury, but because the evidence in the defendant's case shared none of the characteristics of the evidence in *Banks* that made it admissible—only one of which was that the defendant suffered a physical injury. *Hobley*, 159 Ill. 2d at 312. Moreover, when this court addressed the defendant's claim again in his post-conviction appeal, this court emphasized that the defendant's new evidence of other allegations of torture would not change the result on retrial because the defendant's consistent assertion has been that he did not confess; thus, evidence that his confession was coerced was irrelevant. *Hobley*, 182 Ill. 2d at 448-50.

Moreover, despite its assertions in its brief that this other evidence is irrelevant, the State's actions reveal that the State finds evidence of the other torture allegations highly relevant. After the briefs were filed, the State filed a motion seeking to stay the proceedings. The basis of the State's motion was that the circuit court was holding a hearing after the remand in *Cannon*, 293 Ill. App. 3d 634, and that this hearing would "address and resolve the issues relating to allegations of police torture in Area 2 which are identical to those raised in the present appeal." The State then explained that "[t]he resolution of the issues in the *Cannon* hearing will have a direct impact on the issues raised in this case." Finally, the State asked this court to stay these proceedings because "petitioner's claims are directly affected by the proceedings in the *Cannon* case." Given the admissions contained in the State's motion, the State's insistence that the other evidence is *irrelevant* is dubious at best.

In sum, as we earlier explained, the fact that the defendant has suffered a physical injury is only one of many factors to consider when determining whether evidence of prior allegations of police brutality are admissible. The question of relevancy is a determination to be made by

the trial court after a consideration of, *inter alia*, the defendant's allegations of torture and their similarity to the prior allegations.

After reviewing the new evidence relied upon by defendant, we believe that it is material and that, as pleaded, would likely change the result upon retrial. In particular, we note that defendant has consistently claimed that he was tortured. In fact, he made this claim during his first court appearance. Moreover, defendant's claims are now and have always been strikingly similar to other claims involving the use of a typewriter cover to simulate suffocation. Additionally, defendant describes the use of a gun as a threat and beatings that do not leave physical evidence. Further, the officers that defendant alleges were involved in his case are officers that are identified in other allegations of torture. Finally, defendant's allegations are consistent with the OPS findings that torture, as alleged by defendant, was systemic and methodical at Area 2 under the command of Burge.

Thus, we believe that defendant has presented sufficient evidence at the pleading stage to entitle him to a hearing. At this hearing, the trial court can evaluate defendant's testimony in light of the OPS report and the relevant prior allegations of torture. Such a hearing will allow the trial court to determine whether (1) any of the officers who interrogated defendant may have participated in systemic and methodical interrogation abuse present at Area 2 and (2) those officers' credibility at the suppression hearing might have been impeached as a result. Consequently, we remand this action to the trial court for a hearing to consider defendant's new evidence relating to other allegations of police misconduct at Area 2.

### Knowing Use of Marva Hall's "Perjured" Testimony

Defendant next claims that the State violated his state and federal constitutional rights by using Hall's

testimony, which the State knew was false. Defendant did not include this issue in his original or amended post-conviction petition. Consequently it is waived. 725 ILCS 5/122—3 (West 1998); *People v. Brisbon*, 164 Ill. 2d 236, 258 (1995).

### Pienta's Volunteered Statement that Defendant Had Taken a Polygraph

Defendant next asserts that Pienta's volunteered statement that defendant had taken a polygraph violated defendant's due process rights to a fair trial. Defendant asserts that Kubalanza was ineffective for failing to raise this issue. After reviewing the record, we agree with the State that defendant failed to raise this issue in his original or amended post-conviction petition. Admittedly, defendant's amended post-conviction petition alleges that this trial counsel was ineffective for failing to respond adequately to Pienta's volunteered statement. On appeal, however, defendant does not argue that his trial counsel was ineffective for his response to Pienta's statement. Rather, he argues that Pienta's statement, by itself, denied defendant of due process. This is a different claim and one that was not raised in defendant's original or amended post-conviction petition. Consequently, it is waived. 725 ILCS 5/122—3 (West 1998).

### State's Failure to Tender the Results of Fingerprint Comparisons

Defendant's final claim is that the State violated *Brady v. Maryland*, 373 U.S. 83, 10 L. Ed. 2d 215, 83 S. Ct. 1194 (1963), by failing to tender to either trial or post-conviction counsel the results of fingerprint comparisons of a fingerprint taken from a cassette recorder found on the victims' porch.

Once again, defendant did not include this claim in his original or amended post-conviction petition. Consequently, the claim is waived. 725 ILCS 5/122—3 (West 1998).

## Motion to Remand

Before oral argument was held, defendant filed a motion to remand this cause to the trial court for a suppression hearing at which "all relevant evidence of torture and injury can be presented." We ordered that motion taken with the case.

After reviewing the record, we conclude that the proper remedy is not to grant defendant a new suppression hearing, but rather to grant defendant a hearing on the claim in his post-conviction petition. Consequently, we deny defendant's motion.

## CONCLUSION

We reverse the trial court's judgment in part and remand this action to the circuit court for an evidentiary hearing on defendant's claims that (1) his attorney was ineffective for failing to present evidence at trial that defendant's confession was involuntary; and (2) substantial new evidence supports defendant's claim that his confession was the result of police brutality. The trial court's judgment is affirmed with respect to defendant's other claims.

*Affirmed in part and reversed in part;*
*cause remanded.*

JUSTICE HEIPLE, concurring in part and dissenting in part:

I agree with the majority that defendant is entitled to an evidentiary hearing on his claim that his trial counsel was ineffective for failing to present evidence at trial that defendant's confession was coerced, and on his claim that new evidence demonstrates that his confession was the product of torture at the hands of police. I write separately however because I believe defendant is also entitled to an evidentiary hearing on his claim that his counsel was ineffective for failing, during the hearing on the motion to suppress defendant's confession, to

make arguments which would have resulted in the admission of additional evidence in support of defendant's claims of torture by police.

## FACTS

On April 19, 1986, Vincent Sanchez and Rafaela Sanchez were found stabbed to death in their home in Chicago. The bodies were discovered after Wayne Washington, a 13-year-old youth who routinely performed odd jobs for the couple, alerted neighbors that the rear door of the Sanchez home was open and that the kitchen floor was bloody. Neighbors subsequently called police. After the police officers discovered the bodies, they questioned Washington. He told police that he had seen Eric Caine and "DeEdward" "across from" the Sanchez residence. Police later located DeEdward and brought him to the police station for Washington to identify.

Shortly thereafter, DeEdward's 16-year-old cousin, Marva Hall, came forward claiming to have information about the murders. At the time she spoke to police, Hall believed that DeEdward had been arrested for the murders and was still in jail. In her statement, Hall claimed that defendant had told her that he, and not Hall's cousin who had also been questioned in connection with the murders, had killed the Sanchezes.

Several days later, defendant was arrested by police on an unrelated matter and was taken to the fourth district police station in Chicago. Shortly thereafter, Detective James Pienta, who was investigating the Sanchez murders, learned that defendant had been taken into custody. Pienta then went to the fourth district police station and transported defendant to Area 2 Violent Crimes headquarters, where defendant was questioned by two officers.

According to police, defendant initially denied knowledge of the Sanchez murders. Subsequently however, defendant told police officers that he, along with another

man, had killed the Sanchezes during the course of a robbery. The police reduced defendant's confession to writing, although defendant refused to sign it.

Defendant acknowledges that he told police that he had committed the Sanchez murders. However, defendant contends that he did so only after he was tortured by police officers during his interrogation. Before his trial, defendant filed a motion to suppress his confession on the ground that it was involuntary. At the hearing on the motion to suppress, defendant testified that he was tortured for an extended period of time by a red-haired officer (later identified as Jon Burge), by Detective Pienta, and by others. According to defendant, the torture included repeated beatings, threats at gunpoint, and suffocation using a gray plastic typewriter cover. In support of his claims, defendant attempted to introduce photographs which allegedly depicted an interior view of the interview room where defendant was questioned. According to a defense offer of proof, the photographs would have shown certain messages which defendant had etched, using a paper clip, into a bench in the interview room when he was left alone after giving his confession. These photographs, which were subsequently introduced at sentencing, showed the following writings on the bench of the interview room:

"I lied about murders police threatened me with violence slapped and suffocated me with plastic—no phone—no dad signed false statement to murders (Tonto) Aaron."

"Sign false statements to murder, Tonto on statements is code word Aaron."

The phrase "Aaron lied" also appears etched on the door to the room.

Defendant argued that these etched statements, made close in time to his confession, strongly supported his claims that his confession had been coerced by means of police torture. The trial court refused to consider

defendant's written statements, however, ruling that they were inadmissible hearsay. This court affirmed the trial court's ruling on defendant's direct appeal. *Patterson*, 154 Ill. 2d at 451-54. In reaching our holding, this court considered and rejected defendant's arguments that the etchings were admissible either under the spontaneous declaration or prior consistent statement exceptions to the hearsay rule. *Patterson*, 154 Ill. 2d at 452-53. This court likewise rejected defendant's arguments that the statements were admissible under the curative admissibility and completeness doctrines. *Patterson*, 154 Ill. 2d at 453-54.[4]

## DISCUSSION

In his post-conviction petition, defendant contends that his trial counsel was ineffective for failing to argue for the admission of the etchings on the grounds that hearsay is admissible at motions to suppress and other pretrial hearings. Defendant argues that this position was amply supported by existing law at the time of the suppression hearing, citing *United States v. Matlock*, 415 U.S. 164, 172-75, 39 L. Ed. 2d 242, 250-52, 94 S. Ct. 988, 993-95 (1974); *Brinegar v. United States*, 338 U.S. 160, 93 L. Ed. 1879, 69 S. Ct. 1602 (1949); *United States v. Bolin*, 514 F.2d 554, 557 (7th Cir. 1975); Fed. R. Evid. 104(a), 1101(d)(1); *People v. Jones*, 75 Ill. App. 2d 332, 337-38 (1966); *People v. Fugate*, 77 Ill. App. 3d 103, 105 (1979); and *People v. Lesure*, 271 Ill. App. 3d 679, 680, 683 (1995). Defendant also contends that his attorney was ineffective for failing to argue that the etchings were admissible to rebut the State's evidence that defendant did not complain of injury or protest his treatment to the paramedic, the assistant State's Attorneys, or the detec-

---

[4]At this stage, defendant makes no argument concerning the correctness of this court's ruling on direct appeal, and as such, that issue is not properly before the court at this time.

tives. Defendant maintains that, had his counsel made these arguments, the results of the suppression hearing would have been different.

In today's opinion, the majority correctly holds that the etchings would have been admissible, even if they were hearsay, in the context of a motion to suppress. The majority refuses to grant defendant an evidentiary hearing on his claim, however, on the ground that defendant has failed to establish a reasonable probability that, had the evidence been admitted, the results of the suppression hearing would have been different. The majority states that the trial court refused to admit the etchings not only because the judge believed them to be hearsay, but also because the judge found that defendant could not establish that the photographs accurately depicted the etchings as they were when the defendant made them, and because the etchings were not relevant to the motion to suppress. The majority holds that these findings indicate that the judge would have given no weight to the etchings even if the photographs had been admitted and, therefore, the result of the suppression hearing would have been the same.

The majority is incorrect. First, the majority misreads the record when it states that the trial judge found that the etchings were not relevant to the motion to suppress. A careful reading of the hearing transcript indicates that it was the testimony of the photographer, not the photographs of the etchings themselves, which the judge found to be irrelevant. That finding, however, was premised upon the judge's belief that the photographs of the etchings were inadmissible as hearsay. In that light, the judge's ruling makes perfect sense. If the photographs are indeed inadmissible hearsay, then the testimony by the photographer concerning how, when, and where the photographs were taken would indeed be irrelevant. However, because this court has now recognized that the

photographs of the etchings were admissible *even if hearsay*, the judge's findings concerning the relevance of the photographer's testimony is shown to be error. Moreover, even if the majority's reading of the record were correct and the judge had found that photographs of the etchings were *themselves* irrelevant to defendant's contention that he was tortured by police, such a finding would be clearly erroneous.

The majority further states that "the trial court \*\*\* specifically found that it did not believe that defendant had established that the etchings in the pictures were in the same condition as the etchings were when defendant allegedly made them." 192 Ill. 2d at 112-13. Indeed, after reiterating its erroneous position that the photographs were inadmissible as hearsay, the court made the following comments:

> "I believe another important aspect that is very disturbing is the point of time where the etchings originated when in fact the investigator went and viewed these etchings. Certainly it would be rather difficult, if not impossible, but it would be difficult for the defense to show that these etchings are exactly as they were on the date indicated herein. There is a point of time, there is a certain possibility of any possible changes that could have been made, which we would have no knowledge of but which would have transpired on this theory \*\*\*."

According to the majority, these statements demonstrate that the trial court would have given no weight to the photographs even if they had been admitted.

The majority reads too much into the trial court's comments. Although the trial court raised the possibility the etchings had been tampered with and expressed skepticism concerning the ability of the defense to establish that the etchings had not been altered from their original form before they were photographed, the court stopped well short of finding that the etchings *had* been tampered with or that the photographs *were* inaccurate. In any event, the trial court's initial erroneous rulings

that the photographs were inadmissible hearsay and that the testimony of the photographer was irrelevant deprived the defense of any meaningful opportunity to establish the accuracy and authenticity of the photographs. Under the circumstances of this case, therefore, I do not believe that *this* court can confidently state that the trial court would have given no weight to photographs which appear to show messages written by defendant immediately after he was allegedly tortured by police. On the contrary, these etchings, if authentic, would be highly probative of the veracity of defendant's claims of torture. Accordingly, I would hold that the allegations of defendant's petition, taken as true, establish a reasonable probability that defendant's confession would have been suppressed if defense counsel had made the proper legal arguments for the admission of the photographs. Defendant is therefore entitled to an evidentiary hearing on this claim.

## CONCLUSION

For the foregoing reasons, I concur in the majority's holding granting defendant evidentiary hearings on the two claims identified in the majority's opinion. I dissent, however, from the majority's refusal to grant an evidentiary hearing on defendant's additional claim that he received ineffective assistance of counsel at the hearing on his motion to suppress his confession.