NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2024 IL App (4th) 220386-U

NO. 4-22-0386

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
May 30, 2024
Carla Bender
4ᵗʰ District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Winnebago County |
| WILLIAM J. BUCK, | ) | No. 01CF1782 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Joseph G. McGraw, |
| | ) | Judge Presiding. |

_____

JUSTICE LANNERD delivered the judgment of the court.
Justices Harris and Vancil concurred in the judgment.

**ORDER**

¶ 1   *Held*: The appellate court affirmed the second-stage dismissal of defendant's amended postconviction petition.

¶ 2   In March 2003, a jury found defendant, William J. Buck, guilty of the first degree murder of Kevin Rice but not eligible for the death penalty. In May 2003, the trial court sentenced defendant to 60 years in prison, with 654 days' credit for time served. Approximately three years later, defendant filed a *pro se* petition for relief under the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2004)). After the passage of more than 11 years, defendant filed a *pro se* amended postconviction petition in June 2017. Another two and a half years passed before the State filed a motion to dismiss defendant's amended petition in December 2019. Then, in June 2021, the court granted the State's motion to dismiss. Later that month, defendant filed a motion asking the court to clarify and reconsider the dismissal, which the court denied in April 2022. On

appeal, defendant raises a host of issues. However, based on the record in this case and the arguments made, we affirm.

¶ 3                             I. BACKGROUND

¶ 4           In the early morning hours of August 3, 2001, Kevin Rice, an off-duty officer with the Rockford Police Department, was shot and killed. Later that month, a grand jury returned a multiple-count indictment charging defendant with, among other things, Rice's murder (720 ILCS 5/9-1(a)(1) (West 2000)).

¶ 5                          A. Motion to Suppress

¶ 6           On October 3, 2001, defendant filed a motion to suppress any and all confessions, statements, and admissions he made prior to, at the time of, or subsequent to his arrest in this case. The motion alleged he was not advised of his *Miranda* rights (see *Miranda v. Arizona*, 384 U.S. 436 (1966)), was denied his right to counsel, and did not knowingly waive his constitutional rights. Further, defendant maintained the police illegally detained him, physically assaulted him, and threatened him with the death penalty if he did not confess to Rice's murder.

¶ 7           On November 26, 2001, the trial court began a hearing on defendant's motion. The State presented evidence defendant had an outstanding arrest warrant on August 3, 2001. Around 7:10 p.m. on that date, a number of officers went to apprehend defendant. Detective Douglas Palmer was one of the officers present. Detective James Randall testified defendant was coming down a flight of stairs toward Randall. Defendant's hood was up, which was blocking his face, and his hands were in the pockets of his sweatshirt. Randall ordered defendant to stop, but defendant continued moving toward the detective and tried to pass him. Randall grabbed defendant around the waist, ordered him to stop, and ordered him to remove his hands from his pockets. After defendant refused to comply, Randall and Palmer tackled him. While on the ground, defendant

continued to refuse to remove his hands from his pockets. Eventually Randall, Palmer, and Detective Robert Veruchi were able to remove defendant's hands from his pockets and apply handcuffs.

¶ 8 The trial court heard testimony Veruchi hit defendant in the head with palm heel strikes before defendant's hands could be removed from his pockets. After defendant was handcuffed, the officers stood him up. Defendant had a small trickle of blood in his nose but no other injuries. Randall offered defendant medical treatment, which defendant declined.

¶ 9 The police officers who testified at the suppression hearing indicated defendant did not ask for an attorney and was not threatened or abused while at the police station. According to the officers, approximately 27 hours after his arrest, defendant made an oral statement, confessing he shot Rice. He also admitted losing his asthma inhaler and keys in the area where the crime occurred.

¶ 10 To the contrary, defendant testified the police officers approached him with guns drawn and were violent at the time of his arrest. Detective Randall threw him to the ground, and other officers kicked and punched him. On the way to the police station, Sergeant Greg Lindmark told defendant he was going to get the death penalty. Defendant claimed he asked for an attorney, but Lindmark told him no lawyer was going to save him now. At the station, Detectives Robert Redmond and Howard Forrester punched him in the ribs and head, threw him to the ground, choked him, and kicked him in the stomach.

¶ 11 According to defendant, he continued to request an attorney. After Detectives Redmond and Forrester abused him, Detectives Andre Brass, Forrester, Lindmark, Eric Bruno, and Deputy Chief Dominic Iasparro were all involved in his interrogation. Defendant claimed Detective Stephen Pirages slapped him in the face and said he would wind up dead when defendant

denied having knowledge of the shooting. After being abused for more than a day, defendant said he gave up and told the officers the information they provided to him during prior interrogations.

¶ 12    Vincent Holmes, who told the police he was with defendant when defendant shot Rice, also testified, when he was questioned on the evening of August 3, 2001, his requests for an attorney were denied, and Detective Redmond abused and threatened him. The police told Holmes he could either cooperate and have his record cleared or be charged with Rice's murder.

¶ 13    Detectives Redmond and Brass denied Holmes had requested an attorney or been threatened, abused, or promised anything.

¶ 14    In ruling on defendant's motion to suppress, the trial court indicated it did not intend to recite all the factors it considered. The court found the evidence established the following: (1) defendant did not follow orders from the police officers, including orders to remove his hands from his pockets, and resisted arrest; (2) defendant tried to push Detective Randall and provided a false name to the officers; (3) the police officers used five to six heel/palm stuns on defendant, and a trickle of blood was created on defendant in some way; (4) defendant was interrogated by Detectives Forrester and Redmond, was informed of his rights, and signed forms indicating he understood his rights, did not request an attorney, and agreed to speak to the officers; (5) Detectives Bruno and Lindmark began questioning defendant at 8:15 p.m. on August 3; (6) food was delivered around 11 p.m.; (7) Deputy Chief Iasparro talked with defendant; (8) Detectives Bruno and Lindmark questioned defendant again; (9) at approximately 3:25 a.m. on August 4, defendant was placed in a holding cell; and (10) at approximately 4 a.m., defendant was booked into the county jail. The court then indicated:

> "Presumably, after having time to eat, sleep and to refresh himself and to clear his head, approximately 25 hours after his arrest, a critical event occurred. That critical

event was that the Defendant requested to speak to officers. I find that the Defendant made a deliberate choice, for what reason I do not know, perhaps as the [S]tate argues to fish for details, Sergeant Huff testified and his testimony was critical and credible to my decision. It was critical and credible testimony, and that is again that it was the Defendant who requested to speak to officers. Thereafter[,] Detective Pirages and Booker came to the jail and took him to the interview room, the Defendant was re-advised of his rights, he waived those rights and he voluntarily and knowingly spoke with the officers.

I find that the State has met its burden of proof by clear and convincing evidence. I find that the palm/heal stuns were administered only to effectuate the arrest of the Defendant, not with an intent to obtain a statement.

The testimony of the various officers was clear, consistent and convincing. I find that the Defendant did not request an attorney, that he was not mistreated while being questioned either physically or mentally.

Now, the Defendant chose to testify, and he testified obviously contrary to the police testimony. I do not find the Defendant's testimony to be believable and credible. The defendant did acknowledge that he knew and understood his rights, he stated he was familiar with his rights, he stated he signed the rights forms, and at times during his testimony he said he was not afraid. In judging a defendant's credibility—in judging this Defendant's credibility I have had the unusual opportunity to hear him on many occasions when he has asked to speak in Courts. Taking these occasions into account has lead [*sic*] me to the ultimate and very firm opinion that his testimony was not and is not believable. His request to speak to

detectives on August the 4th at or about 8:00 p.m. is consistent with his courtroom actions and demeanor. Further, I do not find the testimony of the Defendant's sister, Miss Wintersmith, or those peripheral witnesses that supported her testimony or the testimony of Vincent Holmes, his testimony being that he was slapped by officers, to erode my finding that the State has met this burden of proof. Actually[,] a jury will have the opportunity to make its own decision. The Motion to Suppress is heard and denied."

¶ 15                                B. The Trial

¶ 16        Because of the extensive nature of defendant's trial, we will not provide a comprehensive summary of the proceedings. Instead, we discuss only the parts of the trial necessary for our decision.

¶ 17        The State presented evidence defendant asked to talk to the police on August 4, 2001, at 8:15 p.m. In response, Detective Sergeant Stephen Pirages went to the jail at approximately 8:35 p.m. Detective Pirages testified he and Sergeant Michael Booker met with defendant at the jail. Defendant indicated he had asked to speak to the police. The officers then walked defendant to an interview room in the detective division of the public safety building. Pirages advised defendant of his *Miranda* rights using a Rockford Police Department advisory form. Defendant indicated he understood his rights and signed the form.

¶ 18        Defendant wanted to know why the police believed Vincent Holmes and not him. Defendant claimed he witnessed Holmes shoot Rice. Pirages then handcuffed defendant and said he and Booker were not going to listen to any more of defendant's lies. Pirages and Booker started walking defendant back to the jail. Once back at the jail, defendant asked to talk to the officers again. Pirages said they would talk to defendant but were not going to listen to more of his lies.

¶ 19    Pirages and Booker then took defendant back to the interview room and removed his handcuffs. After defendant requested and was given a soda, he continued to claim Holmes was the shooter. The officers told defendant that Holmes's story was more believable. Further, they had corroborated information Holmes had provided. Pirages testified defendant was told he

> "fit the description of the person that was seen running from the area of the murder, that he had in fact told a couple people that he was involved in the shooting, that he had been seen earlier in the evening wearing a black hooded sweat shirt, that he was known to carry a .380[-]caliber semiautomatic pistol, and that in fact his inhaler—or what we believed was his inhaler and apartment keys[—]were found in the area of the homicide. We told him there was no question in our mind that he was the shooter of Detective Rice."

According to Pirages, defendant then said, "We wasn't planning on murdering that man. We were going out to do a lick." Defendant said he had a .380-caliber weapon. However, that night, he was armed with a .38-caliber revolver and Holmes was armed with a .380-caliber semiautomatic pistol. Pirages told defendant they did not believe him. Pirages laughed when defendant claimed he threw the .38-caliber revolver in the river. Defendant later said he gave the .38-caliber revolver to a man named "Buddy" at the Auburn Manor apartment complex. Pirages testified the officers continued to tell defendant they did not believe his story.

¶ 20    Shortly after 10 p.m., defendant apologized for telling the officers so many different versions of events. Pirages then got defendant another soda and a bag of potato chips. Defendant then told Pirages and Booker he had not been truthful, he had been in possession of the .380-caliber weapon, no one had a .38-caliber revolver, and Holmes only had a screwdriver. According to defendant's statement, it looked like the driver was getting out of the car that pulled up to him and

Holmes. Defendant said, "I was scared. I just shot, and I ran." The officers asked defendant to be truthful. Defendant said that was hard to do. He then confessed, stating, "I took a man's life. I f*** up. I pulled the trigger, but in my heart it was an accident."

¶ 21        At that point, defendant started to tear up a bit. He said he was armed with a .380-caliber weapon, Holmes had a screwdriver, and they had gone out to do a "lick." While walking north on Hoban Avenue, a car driving southbound passed them. The car turned around, drove toward them, and stopped next to them. Defendant said he was behind Holmes and could not hear what was being said between Holmes and the driver. At that point, defendant removed the .380-caliber weapon from his pocket and had it down by his leg. He then got scared, shot, and ran. According to defendant's statement, he ran to the east through the yards on Hoban Avenue and lost his inhaler and apartment keys. Defendant indicated Holmes ran north on Hoban Avenue. When defendant arrived at the rear of the Auburn Manor apartment complex, he hid the gun and later met up with Holmes, telling him where he hid the weapon. The police were unable to locate the weapon. Defendant declined to give a written statement.

¶ 22        Vincent Holmes also testified at defendant's trial, indicating he was serving a 51-month prison sentence after pleading guilty to a drug charge on May 24, 2002, and had a prior conviction for a drug charge in September 2002. Holmes indicated he had only known defendant, who was not a close friend, for three to four weeks before the shooting. They were together by chance at the Auburn Manor apartment complex late on August 2, 2001, and into the early hours of August 3, 2001. They discussed committing a robbery. While claiming at trial that he did not remember who first mentioned committing a robbery, Holmes agreed he told investigators on August 4, 2001, that it was defendant. Defendant told Holmes to find a screwdriver so they could steal a car. Holmes did so and then met back up with defendant.

¶ 23    While Holmes and defendant were walking away from the Auburn Manor apartment complex, defendant showed Holmes a small pistol he possessed. On Hoban Avenue, the two men found a car to break into. Holmes unsuccessfully tried to break the car's window with a rock. Defendant hid behind a bush and said he would shoot anyone who might approach.

¶ 24    After failing to get into the vehicle, Holmes and defendant started walking up Hoban Avenue. A car then passed them driving in the opposite direction, turned around, drove toward them, and stopped. The driver asked what they were doing in the neighborhood. While Holmes responded that he did not know what the driver was talking about, he saw defendant firing his gun and heard five or six shots. Holmes then ran down Hoban Avenue and made his way back to Auburn Manor. He saw defendant run and jump over a fence. After staying in two different apartments for a short period of time, Holmes went outside and asked defendant why he shot the man. According to Holmes, defendant said to forget about it because the man is dead. Holmes admitted telling the police that defendant also said it was just one of those nights and just another guy. Holmes also testified he told the police defendant said he dropped his keys and inhaler when he jumped the fence.

¶ 25    Holmes testified he was interviewed by the police on August 4, 2001, and testified before the grand jury on August 6, 2001. On September 27, 2001, he signed a cooperation agreement with the State which provided that—if he provided a full, complete, and truthful description of all relevant information related to Rice's murder—he would not be charged with any offense related to his presence with defendant when defendant shot and killed Rice.

¶ 26    On cross-examination, Holmes indicated he originally told the police he did not know anything about the shooting and asked for a lawyer, which he did not receive. He also initially told the police he was not present when the shooting occurred. According to Holmes,

Detective Redmond hit him in the face and threatened to punch him through the wall. Holmes also maintained that he did not think he was going to get out of the police station and told the officers what they wanted him to say. The officers had told him they thought he was the shooter and would get a life sentence or the death penalty. At that point, according to Holmes, he told the police he was involved but was not the shooter. The police then told him they would not charge him. Holmes testified he had not been charged with anything in connection with Rice's murder.

¶ 27    Holmes also admitted he had been selling marijuana, cocaine, and crack cocaine since he was 16 or 17 years old, had been placed on probation in 2000 for possession with intent to deliver, had continued to sell and use drugs while on probation, and had lied to his probation officer about doing so. After the shooting in this case, Holmes continued to sell drugs and was arrested again in October 2001. He also was charged with criminal trespass and unlawful use of a weapon in September 2001 and had another drug arrest in 2002. To his knowledge, a petition to revoke his probation had not been filed. When asked whether he was facing charges related to Rice's murder, Holmes said he was not aware of any charges, and his fate rested with the State. When asked how gunshot residue could have been found on the pants he was wearing the night Rice was shot, Holmes said he did not know.

¶ 28    The jury also heard evidence a bullet was recovered from Rice's car and six spent .380-caliber cartridge cases, which were all fired from the same weapon, were found near the car's driver's side. In addition, an asthma inhaler and two keys on a ring were found along a fence that ran between 827 and 903 Hoban Avenue. Defendant notes in his brief that the State did not identify the officer who found the inhaler and keys. No fingerprints were found on the keys, cartridge cases, or inhaler.

¶ 29    After considering the evidence presented, the jury found defendant guilty of first

degree murder but found him ineligible for the death penalty. The trial court sentenced defendant to a 60-year term of imprisonment.

¶ 30                                    C. Direct Appeal

¶ 31        On direct appeal, defendant made the following arguments: (1) the trial judge should have been disqualified, (2) defendant should have received a pretrial hearing to determine his eligibility for the death penalty, (3) the jury should not have been informed Rice was a police officer during the guilt/innocence portion of the trial, and (4) the trial court erred by failing to instruct the jury regarding the reliability of electronically recorded confessions. *People v. Buck*, 361 Ill. App. 3d 923, 926 (2005). The Second District affirmed the trial court's judgment. *Id.* at 946.

¶ 32                              D. Postconviction Proceedings

¶ 33        In May 2006, defendant filed a *pro se* postconviction petition, making the following claims: (1) his constitutional right to choose his own counsel and proceed *pro se* was violated*;* (2) his right to a speedy trial was violated; (3) the State improperly impeached its own witness, Holmes, and treated him as a hostile witness without leave of the court; (4) the State's opening statement and closing argument were inflammatory, misstated evidence, and misled the jury; (5) his trial counsel was constitutionally ineffective because he failed to impeach Holmes with an affidavit in defense counsel's possession that exonerated defendant, failed to have forensic testing performed on a bloodstained sweatshirt, failed to impeach Patrick Johnson, and failed to call alibi witnesses; (6) new evidence suggested Detective Palmer, who was involved in defendant's arrest, was involved in illegal acts, calling into question the trial court's denial of defendant's motion to suppress; (7) an African-American woman was improperly excluded from his jury; (8) the State was allowed to admit an inhaler, keys, and a hoodie without a proper evidentiary foundation;

(9) new evidence in the form of an affidavit from Marcus Holmes suggests defendant is actually innocent of Rice's murder; and (10) his appellate counsel was conflicted and constitutionally ineffective for filing an inadequate brief that raised moot issues.

¶ 34        On June 5, 2006, the trial court appointed counsel to represent defendant in this postconviction proceeding. On June 22, 2006, the public defender's office filed a motion to withdraw. That same day, the court granted the motion to withdraw and appointed attorney David Caulk, a conflict attorney, to represent defendant. Between attorney Caulk's appointment and April 25, 2008, Caulk indicated he had been reviewing the voluminous record and reviewing the case file with defendant, and he was waiting for correspondence from defendant. At a hearing on August 22, 2008, attorney Caulk indicated defendant had filed an administrative matter that needed to be resolved before Caulk could proceed further on the postconviction petition. Approximately two months later, Caulk indicated the administrative matter was pending before the Illinois Attorney Registration and Disciplinary Commission (ARDC). On March 20, 2009, Caulk advised the court the ARDC matter had been resolved. However, Caulk was given leave to withdraw from the case about one month later because his employment with the county had concluded.

¶ 35        The trial court then assigned defendant's case to attorney Michael Phillips. At a hearing on October 23, 2009, Phillips indicated he had received correspondence from defendant. However, counsel noted defendant's "writings do not explain what he's trying to argue." On July 9, 2010, defendant appeared with Phillips at a status hearing on the postconviction petition. Phillips indicated he had briefly spoken to defendant before the hearing but asked for defendant to be remanded to the custody of the sheriff for two weeks so Phillips could consult with defendant further regarding his claims.

¶ 36        On July 23, 2010, Phillips indicated he had met with defendant. Defendant had

given him information on witnesses to contact and attempted to acquire affidavits to use in an amended petition. At a hearing on October 8, 2010, Phillips maintained defendant had presented several issues he wanted Phillips to investigate. On July 22, 2011, according to Phillips, defendant had requested Phillips do further research before he prepared the amended petition. Then, in October 2011, Phillips told the trial court he had received several affidavits and correspondence from defendant, which Phillips was reviewing. Phillips believed additional interviews might be required. At a hearing on January 6, 2012, Phillips indicated he had recently received a letter from defendant with the names and addresses of three individuals who defendant purported were critical witnesses Phillips needed to interview.

¶ 37        The trial court ordered Phillips to inform defendant that defendant needed to identify or disclose any additional witnesses he wanted Phillips to interview before February 24, 2012. At a hearing on February 24, 2012, Phillips stated defendant had provided him photocopies of affidavits. Phillips also indicated some of the affidavits would not be appropriate to attach to an amended petition because they did not discuss defendant's case in any way. Phillips also maintained he was waiting on an affidavit that defendant believed was critical.

¶ 38        On May 25, 2012, defendant appeared with Phillips before the trial court. Defendant told the court he objected to the unconstitutional delays with regard to his petition, asked the court to provide funds for an investigator, and requested to be remanded to the county jail for 30 days so he could communicate with Phillips. Phillips informed the court he previously had filed a motion to withdraw as counsel because defendant wanted him to include certain allegations in the amended petition that Phillips maintained could not be included. However, after meeting with defendant in person, Phillips told the court he believed defendant understood why those allegations could not be included in the amended petition at that time. The court allowed

- 13 -

Phillips to withdraw his motion to withdraw.

¶ 39        At a hearing on October 5, 2012, Phillips informed the trial court he was mailing a draft of a first amended postconviction petition to defendant for his review and input. Just over two months later, Phillips advised the court defendant was not pleased with the proposed amended petition and asked Phillips to add multiple legal arguments that defendant had advocated for earlier in the case. Between December 6, 2012, and April 1, 2014, Phillips and defendant could not agree on what claims should be included in the amended petition. Phillips' contract as conflict counsel with the county terminated on April 1, 2014.

¶ 40        On August 15, 2014, the trial court appointed attorney David Carter as conflict counsel for defendant. In March 2016, attorney Carter told the court defendant's family had retained a private investigator. Carter also informed the court he was not adopting defendant's *pro se* postconviction petition and needed to wait until the investigator's work was done before filing an amended pleading.

¶ 41        In the middle of June 2016, attorney Carter told the trial court the investigator had finished his work on the case. Carter informed the court in January 2017 that he had sent an amended petition to defendant for his review. At a hearing on March 31, 2017, Carter asserted defendant was not pleased with the proposed amended petition because it did not include the issue the investigator had explored. According to Carter, defendant wanted to proceed *pro se* and would not respond to any communications from Carter.

¶ 42        On June 2, 2017, defendant, who was present, expressed to the trial court his displeasure with attorney Carter and indicated he wanted to proceed *pro se*. The court advised defendant he would be held to the same standard as any lawyer and the court would not help him with his pleadings or his case. Defendant indicated he still wanted to proceed *pro se*, which the

court allowed. Defendant then filed his *pro se* amended postconviction petition.

¶ 43　　　　The amended petition contained the same claims from his original *pro se* petition and some new claims. Defendant alleged Detective Palmer and other detectives engaged in illegal acts, calling into question the denial of his motion to suppress. He also presented an actual innocence claim based on new evidence indicating the gunshot residue expert was directed to evidence to support the State's case. With regard to his ineffective assistance of appellate counsel claim, defendant added an allegation his appellate counsel refused to raise trial counsel's ineffectiveness because appellate counsel's superiors were part of the defense team at defendant's trial, creating a conflict of interest. In addition, defendant added a new claim his constitutional rights were violated when Holmes's perjured testimony was used to indict and convict him. Finally, he alleged his constitutional rights were violated because he received a 60-year prison sentence when he was a 19-year-old "juvenile."

¶ 44　　　　On December 17, 2019, the State filed a motion to dismiss defendant's amended postconviction petition. The State argued none of defendant's claims met the standard for relief under the Act. According to the State, the claims found in parts I, II, III, IV, VI, VII, VIII, and IX of the amended petition had either been forfeited because they were not raised in defendant's direct appeal or were barred by the doctrine of *res judicata* because they were decided on direct appeal. As for the claim in part V alleging defendant's trial counsel was ineffective, the State argued the alleged actions of trial counsel were matters of trial strategy and defendant could not show prejudice. Finally, the State contended these issues could have been raised on direct appeal.

¶ 45　　　　Turning to defendant's actual innocence claim based on newly discovered evidence in part IX of the amended petition, the State argued the information provided did not constitute newly discovered evidence. According to the State:

"The named witnesses were available to defendant if he had exercised due diligence. At the trial the facts surrounding Holmes['s] arrest were thoroughly examined by defense counsel[,] Mr. Light. The evidence defendant now submits is merely cumulative and not of such a conclusive nature it would have changed the result at trial."

Because the State alleged defendant had failed to put forth an actual innocence claim, the State resubmitted their arguments as to *res judicata* and forfeiture.

¶ 46    In response to defendant's claim in part X of the amended petition that his appellate counsel was ineffective, the State maintained defendant's appellate counsel was not ineffective. According to the State, defendant's appellate counsel forwarded a letter to defendant explaining why he chose to raise the issues on appeal that were raised.

¶ 47    Turning to defendant's claim the State knowingly used perjured testimony when presenting Holmes as a witness in part XI of the amended petition, the State asserted defendant did not establish the State knowingly used false testimony. According to the State, defendant did not allege the State knowingly used false testimony or failed to exercise appropriate diligence. Instead, Holmes's testimony—at best—only showed he was a very uncooperative witness, requiring the State to impeach him at defendant's trial.

¶ 48    After a hearing on May 20, 2021, the trial court entered a written memorandum of decision on June 16, 2021, concluding the claims found in parts I, II, III, IV, VI, VII, VIII, and XI of the amended petition were barred by the doctrine of *res judicata* and/or forfeiture. As for defendant's claims of ineffective assistance of trial counsel in part V and ineffective assistance of appellate counsel in part X, the court determined those claims failed because defendant's complaints pertained to matters of trial strategy, counsel was not required to litigate or raise claims

that would not be successful, and defendant did not establish the elements required for him to receive relief under *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984). Turning to defendant's actual innocence claim in part IX, the court concluded this claim failed because the evidence and witnesses were known or the information was cumulative and not likely to change the outcome of defendant's case.

¶ 49 On June 21, 2021, defendant filed a motion to reconsider and for clarification. Defendant noted the trial court did not address the sentencing claim raised in part XII of his amended petition. Defendant filed a notice of appeal on July 9, 2021, and another on July 13, 2021. Thereafter, the Second District granted defendant's motion to voluntarily dismiss because his motion to reconsider and for clarification had not been addressed.

¶ 50 On April 21, 2022, the trial court entered an order denying defendant's motion for reconsideration and clarification. Although not mentioned by number, the court indicated its ruling on defendant's claim in part XII of the amended petition was incorporated inferentially in the court's June 16, 2021, order. In addition, the court stated as clarification that the claim in part XII was forfeited and failed to state a constitutional claim.

¶ 51 On May 9, 2022, defendant filed another notice of appeal. The Office of the State Appellate Defender (OSAD) was appointed to represent defendant on appeal. On May 12, 2022, OSAD filed an amended notice of appeal on defendant's behalf. The Exoneration Project is now representing defendant on appeal.

¶ 52 II. ANALYSIS

¶ 53 A. General Principles

¶ 54 On appeal, defendant is challenging the second-stage dismissal of his amended postconviction petition. The Act "provides a method by which persons under criminal sentence

- 17 -

can assert that their convictions were the result of a substantial denial of their federal or state constitutional rights." *People v. Urzua*, 2023 IL 127789, ¶ 32. The doctrine of *res judicata* bars courts from considering claims in a postconviction petition raised and decided on direct appeal. *People v. Pitsonbarger*, 205 Ill. 2d 444, 456 (2002). Issues a defendant could have, but failed to, raise on direct appeal are considered forfeited and may not be raised in a postconviction petition. *Id.* "Any claim of substantial denial of constitutional rights not raised in the original or an amended petition is [forfeited]." 725 ILCS 5/122-3 (West 2022).

¶ 55 Section 122-2 of the Act (725 ILCS 5/122-2 (West 2022)) states, in part:

> "The petition shall identify the proceeding in which the petitioner was convicted, give the date of the rendition of the final judgment complained of, and clearly set forth the respects in which petitioner's constitutional rights were violated. The petition shall have attached thereto affidavits, record, or other evidence supporting its allegations or shall state why the same are not attached."

During the first stage of postconviction proceedings, the trial court independently reviews the postconviction petition and shall dismiss the petition if it is frivolous or patently without merit. *Urzua*, 2023 IL 127789, ¶ 32. A petition advances to the second stage of postconviction proceedings "if (1) the court fails to rule on the petition within the 90-day period, regardless of the petition's merit [citation], or (2) the facts alleged in the petition state an arguable claim of constitutional deprivation [citation]." *Id.*

¶ 56 During the second stage of postconviction proceedings, "the petitioner bears the burden of making a substantial showing of a constitutional violation." *People v. Domagala*, 2013 IL 113688, ¶ 35. The State may either answer or move to dismiss the defendant's petition or amended petition if one has been filed. *Urzua*, 2023 IL 127789, ¶ 34. If the State files a motion to

dismiss, "the circuit court must determine whether the petition and accompanying documents make a substantial showing of a constitutional violation." *Id.* If the petition does not, dismissal of the petition is appropriate. *Id.* Evidentiary questions are not to be resolved during second-stage proceedings. *Domagala*, 2013 IL 113688, ¶ 35. According to our supreme court:

> " 'At the dismissal stage of a post-conviction proceeding, all well-pleaded facts that are not positively rebutted by the original trial record are to be taken as true. The inquiry into whether a post-conviction petition contains sufficient allegations of constitutional deprivations does not require the circuit court to engage in any fact-finding or credibility determinations. The Act contemplates that such determinations will be made at the evidentiary stage, not the dismissal stage, of the litigation. Due to the elimination of all factual issues at the dismissal stage of the post-conviction proceeding, a motion to dismiss raises the sole issue of whether the petition being attacked is proper as a matter of law.' " *Id.* (quoting *People v. Coleman*, 183 Ill. 2d 366, 385 (1998)).

Our supreme court has further explained:

> "Unless the petitioner's allegations are affirmatively refuted by the record, they are taken as true, and the question is whether those allegations establish or 'show' a constitutional violation. In other words, the 'substantial showing' of a constitutional violation that must be made at the second stage [citation] is a measure of the legal sufficiency of the petition's well-pled allegations of a constitutional violation, which if proven at an evidentiary hearing, would entitle petitioner to relief." (Emphasis omitted.) *Id.*

To make a substantial showing of a violation of a constitutional right, a petitioner's allegations

must be supported by the record in the case or by accompanying material. *Coleman*, 183 Ill. 2d at 381. "Nonfactual and nonspecific assertions which merely amount to conclusions are not sufficient to require a hearing under the Act." *Id.*

¶ 57    This court's review of the dismissal of a postconviction petition at the second stage of postconviction proceedings is *de novo*. *Urzua*, 2023 IL 127789, ¶ 28.

¶ 58                    B. Defendant's Decision to Proceed *Pro Se*

¶ 59    Defendant argues this court should give his amended postconviction petition a generous interpretation because he was forced to file his amended petition *pro se* after his court-appointed attorneys neglected to do so for an extended period of time. We disagree for the following reasons. First, the record indicates defendant's appointed attorneys provided him with at least two proposed amended petitions. However, defendant was not pleased with either because he wanted additional claims included. Second, the Illinois cases defendant cites for this proposition (*People v. Hodges*, 234 Ill. 2d 1, 23 (2009); *People v. Thomas*, 2014 IL App (2d) 121001, ¶ 5) involved first-stage summary dismissals and are not relevant here because we are in the second stage of postconviction proceedings. Finally, before the trial court granted defendant's request to proceed *pro se* during the second stage of postconviction proceedings, it warned defendant that he would be held to the same standard as a lawyer if he chose to represent himself instead of taking advantage of the services of his court-appointed attorney. Regardless of this warning, defendant chose to proceed *pro se*.

¶ 60                              C. New Evidence

¶ 61    Our supreme court has recognized that the doctrine of *res judicata* can be relaxed if a defendant presents substantial new evidence. *People v. Patterson*, 192 Ill. 2d 93, 139 (2000). According to the court:

"For new evidence to be sufficient to warrant a new trial, it must be of such conclusive character that it will probably change the result upon retrial. [Citations.] Furthermore, the evidence must be material and not merely cumulative, and it must have been discovered since the trial and be of such character that it could not have been discovered prior to trial by the exercise of due diligence." (Internal quotation marks omitted.) *Id.*

In *People v. Galvan*, 2019 IL App (1st) 170150, ¶ 66, the First District explained:

"New means the evidence was discovered after trial and could not have been discovered earlier through the exercise of due diligence. [Citation.] Material means the evidence is relevant and probative of the petitioner's innocence. [Citation.] Noncumulative means the evidence adds to what the jury heard. [Citation.] And conclusive means the evidence, when considered along with the trial evidence, would probably lead to a different result."

¶ 62                                    1. *Alleged Police Misconduct*

¶ 63        Many of defendant's arguments on appeal are associated with what he characterizes as new evidence of the abusive conduct of the Rockford police officers who arrested and interrogated him in this case. According to defendant, this new evidence requires relief because it would likely change the outcome of his motion to suppress and his trial.

¶ 64        Citing several cases decided by Illinois courts (see *People v. Whirl*, 2015 IL App (1st) 111483, ¶ 80; *Patterson*, 192 Ill. 2d 93, 145 (2000); *Galvan*, 2019 IL App (1st) 170150, ¶ 74; *People v. Tyler*, 2015 IL App (1st) 123470, ¶ 189; *People v. King*, 192 Ill. 2d 189, 198-99 (2000); *People v. Cannon*, 293 Ill. App. 3d 634, 640 (1997); *People v. Mitchell*, 2012 IL App (1st) 100907, ¶ 62), defendant notes, "Illinois courts recognize an independent post-conviction due process claim

under the federal constitution when newly discovered evidence reveals systemic police misconduct that contributed to an unconstitutional conviction." In addition, according to defendant, "Illinois courts have consistently held that a 'pervasive pattern of criminal conduct by police officers' is enough for courts to reconsider the voluntariness of a defendant's confession." See *Tyler*, 2015 IL App (1st) 123470, ¶ 189.

¶ 65                      a. Testimony of Former Detective Douglas Palmer

¶ 66        According to defendant, an evidentiary hearing is warranted in the instant case because "evidence of the [Rockford Police Department] officers' *modus operandi* provides strong support for [defendant's] allegations that the witnesses against him were swayed by the officers' unlawful influence and that his supposed confession was coerced." As an attachment to his amended postconviction petition, defendant included a transcript of testimony provided by former Rockford Police Department detective Douglas Palmer at a hearing related to postconviction claims brought by Tyjuan Anderson, Lumont Johnson, and Anthony Ross. During Palmer's testimony in that case, he admitted that he engaged in serious misconduct, leading to the convictions of those three men.

¶ 67        At one point during Palmer's testimony in that case, while being cross-examined by the State, he stated:

> "[I]f she's going to keep going down this road, I'll start naming names, giving dates, giving case numbers of a lot of illegal stuff that I witnessed and took part of, gladly, if she wants to keep going down this road and beating me up. I didn't kill anybody. I'm here to tell the truth, Your Honor. I've got dates, times, civil rights violations all documented. If they want to keep going, I'll keep going. I didn't come here to tell on anybody but myself and to tell the truth. These three men did not do this

crime[,] period."

While this is troubling testimony, it is also extremely vague and conclusory. Palmer provided no specific information regarding any systemic abuse by any Rockford police officers. Further, he provided no information regarding any wrongdoing by any police officers during the investigation in *this case*. In fact, from the record, it appears Palmer did not have any involvement in this case after defendant was taken into custody.

¶ 68 Based on the record before this court, defendant has failed to establish Palmer's vague and conclusory testimony in a completely different case was of such a conclusive character that it would likely either alter the ruling on defendant's motion to suppress in this case or the result at defendant's trial. See *Galvan*, 2019 IL App (1st) 170150, ¶ 68 ("The issue is not whether the confession itself was voluntary, 'but whether the outcome of the suppression hearing likely would have differed if the officer who denied harming the defendant had been subject to impeachment based on evidence revealing a pattern of abusive tactics employed by that officer in the interrogation of other suspects.' "). Even accepting Palmer's testimony in the other case as true, the record before this court does not indicate Palmer admitted to any misconduct in this case or accused any officer of engaging in any misconduct while working on this case or engaging in systemic abusive behavior. Defendant speculates Palmer likely would make specific admissions that detectives engaged in misconduct in this case to induce defendant's confession if called to testify under oath. However, as pointed out by the State, the record reflects an investigator hired by defendant's family met with Palmer about this case but "didn't find anything there."

¶ 69 b. Exoneration of John Horton

¶ 70 Defendant also cites publicly available information related to the exoneration of John Horton. According to defendant, some of the same detectives who interrogated both him and

Holmes—Detective Redmond, Detective Forrester, and Detective Brass—and the prosecutor in this case were discredited in the proceedings related to Horton. See *People v. Horton*, 2016 IL App (2d) 141059-U, ¶¶ 11, 17; *People v. Horton*, 1993 CF 1991 (Dec. 17, 2018). According to defendant's brief, "Horton proved to the circuit court that he, too, was framed by this same corrupt crew of [Rockford Police Department] detectives."

¶ 71    We note defendant did not attach anything to his amended postconviction petition about Horton's case. For a defendant to make a substantial showing his constitutional rights were violated, his allegations must be supported by the record in the case or accompanying material. *Coleman*, 183 Ill. 2d at 381. Because defendant failed to attach any documentation to his amended petition regarding Horton's case, the trial court did not consider that information when dismissing defendant's amended petition. Therefore, on appeal, defendant cannot rely on evidentiary information from Horton's case that is not part of the record before this court.

¶ 72                    2. *Marcus Stone's Affidavit*

¶ 73    Defendant next argues the evidence of corruption at the Rockford Police Department should be considered alongside the affidavit of Marcus Stone, which indicated Holmes told Stone that he, not defendant, killed Rice. According to defendant's brief, "Stone's affidavit about Holmes admitting to being the shooter in this case is evidence that is new, material, and noncumulative: Holmes made his admission of guilt after the trial, such evidence was not presented at trial, and it exonerates [defendant]."

¶ 74    The State argues defendant has attached conflicting affidavits to his petition. Stone's affidavit indicates that Holmes confessed he committed the murder. However, defendant also attached an affidavit from Holmes indicating he had no information about the crime. According to the State, both of these affidavits cannot be taken as true.

¶ 75        Regardless, considering we have determined defendant did not show that Palmer's testimony would likely alter the trial court's ruling on defendant's motion to suppress, defendant cannot establish that Marcus Stone's affidavit would likely alter the result at defendant's trial considering the State could rely on defendant's confession.

¶ 76                    D. Alleged Due-Process Violations

¶ 77        We next address defendant's arguments regarding alleged violations of his due process rights.

¶ 78            1. *Pattern of Misconduct by Officers of the Rockford Police Department*

¶ 79        According to defendant's brief, "Illinois courts recognize an independent post-conviction due process claim under the federal constitution when newly discovered evidence reveals systemic police misconduct that contributed to an unconstitutional conviction." As stated above, defendant has failed to establish that anyone in the Rockford Police Department engaged in either a pattern of misconduct or any misconduct in *this particular case*. As a result, we address this issue no further.

¶ 80            2. *Alleged Presentation of False Evidence by the State*

¶ 81        Defendant next argues the State violated his due process rights by presenting evidence it knew was false or allowed false evidence to go uncorrected. Defendant contends:

> "[F]ederal due process violations derive from the detectives' falsities and deceptions, as described above. And federal due process violations also arise from the prosecution's presentation of its witness Vincent Holmes'[s] false testimony.
>
>     The record presents ample evidence that must be credited at this juncture that Holmes['s] testimony was not only false, but that the prosecution knew it was false."

As previously stated, defendant has failed to show the detectives in *this case* engaged in false or deceptive behavior that violated defendant's constitutional rights. Further, defendant has also failed to establish the State had any knowledge Holmes provided false testimony.

¶ 82 Clearly, Holmes's statements to the police and his affidavits were not entirely consistent. However, this does not establish the State knew the evidence it was presenting from Holmes was false.

¶ 83 E. *Brady* Violation

¶ 84 Defendant next argues his amended postconviction petition contains sufficient information from which this court can infer the State violated *Brady v. Maryland*, 373 U.S. 83 (1963), by suppressing evidence of the Rockford Police Department's "era of rampant misconduct relevant to this case." The State responded that defendant did not include this claim in his amended postconviction petition. Therefore, the claim is forfeited. See 725 ILCS 5/122-3 (West 2022). We agree and address this issue no further.

¶ 85 F. Ineffective Assistance of Counsel

¶ 86 Defendant next argues the trial court erred by dismissing his amended petition because he made substantial claims of ineffective assistance of counsel. To establish counsel was constitutionally ineffective, a defendant must show defense counsel's performance was objectively unreasonable and that a reasonable probability exists the result of the trial would have been different absent counsel's deficient performance according to *Strickland*.

¶ 87 1. *Trial Counsel's Cross-Examination of Vincent Holmes*

¶ 88 According to defendant, his trial counsel was constitutionally ineffective because he failed to use Vincent Holmes's December 16, 2002, affidavit to impeach Holmes's trial testimony. In the affidavit, Holmes stated that during an interview with the police on August 3,

2001, he provided detectives "false information concerning an incident and implicated [defendant] as a suspect." Holmes stated in the affidavit that he was denied counsel, threatened by the police he would be charged with murder if he did not provide the information the detectives wanted, and was hit and threatened by Detective Redmond. According to the affidavit, Holmes was scared, did not know anything about the incident, did not participate in the incident, and had no knowledge of defendant's participation in the incident.

¶ 89       Defendant notes that, when Holmes was testifying at defendant's trial, Holmes tried to testify about the abuse inflicted on him by the detectives investigating the case. However, each time Holmes attempted to do so, the State impeached Holmes with his custodial statement implicating defendant. Defendant argues Holmes's handwritten affidavit would have been strong evidence for defense counsel to use to disavow Holmes's inculpation of defendant.

¶ 90       While the failure to impeach a key witness can constitute deficient performance (*People v. Lawson*, 2019 IL App (4th) 180452, ¶ 53), the manner in which defense counsel impeaches a witness is considered a matter of trial strategy and is generally immune from claims of ineffective assistance of counsel. *People v. Phillips*, 2017 IL App (4th) 160557, ¶ 58. While defense counsel did not specifically mention Holmes's December 2002 affidavit during Holmes's cross-examination, defense counsel thoroughly attacked Holmes's credibility and his incentive to testify against defendant. Defendant has failed to make a substantial constitutional claim that his trial counsel was ineffective in the manner in which he cross-examined Holmes.

¶ 91       2. *Appellate Counsel's Failure to Argue Trial Counsel Was Ineffective*

¶ 92       Defendant next asserts his direct appeal appellate counsel was ineffective. The basis of defendant's argument is that appellate counsel in his direct appeal should have argued defendant's trial attorneys were ineffective for not objecting when the State "repeatedly and

vehemently vouched" for the police officers in this case during the State's closing argument. However, as the State noted in its brief, this specific claim was not raised in defendant's amended postconviction petition.

¶ 93    In part X of defendant's amended petition, defendant claimed his direct appeal appellate counsel was ineffective for arguing moot issues regarding the death penalty, for which the jury found defendant was not eligible. Defendant also asserted his appellate counsel had a conflict of interest because Deputy Appellate Defender Stephen Richards, who defendant claimed was one of appellate counsel's "superiors," and an assistant appellate defender were attorneys for defendant in the trial court. Finally, defendant claimed appellate counsel was ineffective for not raising some of the viable issues defendant included in his amended petition. However, while defendant did mention inflammatory statements made during the State's closing argument in part IV of his amended petition, he did not argue trial counsel was ineffective for not objecting to these statements.

¶ 94    Because defendant's amended petition did not claim his direct appeal counsel was ineffective for failing to argue defendant's trial attorneys were ineffective for not objecting to the parts of the State's closing argument where the State allegedly vouched for its witnesses, we agree with the State that this claim is forfeited. See 725 ILCS 5/122-3 (West 2022). As such, we will not address it further.

¶ 95                        G. Defendant's Sentence

¶ 96    We next turn to defendant's claim his constitutional rights were violated because he was sentenced as a juvenile to a 60-year sentence to be served in its entirety. According to his petition, "It has now been established that sentencing a juvenile to the equivalent of a life sentence is unconstitutional." However, defendant also acknowledges in his petition he was over 19 years

old when he was arrested in this case on August 3, 2001. Therefore, he would have been at least 18 when the offense was committed and *not a juvenile*.

¶ 97 On appeal, defendant argues his "petition allege[d] an as-applied challenge to [his] effective life sentence *** based on the evolving science on juvenile maturity and brain development under the proportionate penalties clause." (Internal quotation marks omitted.) However, defendant failed to provide this court with any analysis or explanation of how he presented a substantial constitutional claim that his sentence violated the proportionate penalties clause. Because this court is not a depository for an appellant to dump the burden of argument and research (*Elder v. Bryant*, 324 Ill. App. 3d 526, 533 (2001)), we find defendant forfeited this claim pursuant to Illinois Supreme Court Rule 341(h)(7) (eff. Oct. 1, 2020).

¶ 98                           H. Cumulative Error

¶ 99 Defendant next appears to argue the cumulative effect of errors occurring at his trial deprived him of his constitutional right to a fair trial. However, once again, as noted by the State, defendant forfeited this claim because he did not include it in his amended postconviction petition. See 725 ILCS 5/122-3 (West 2022). As a result, we will not address this claim any further.

¶ 100                          I. Delay in Filing

¶ 101 Finally, defendant argues this court should grant him a new trial because of the long delay between counsel being appointed to represent him and the filing of his *pro se* amended postconviction petition. Like our supreme court in *People v. Lighthart*, 2023 IL 128398, ¶ 23, we are troubled by the duration of the second-stage proceedings in the instant case. In a complicated case like this one, a trial court should be hesitant to allow an attorney to withdraw simply because his or her contract with the county has expired, considering the length of time it takes a new attorney to familiarize him- or herself with the case.

¶ 102 However, based on our review of the record, defendant has no legitimate claim he is entitled to a new trial simply because of the duration of second-stage postconviction proceedings. Defendant caused many of the delays in this case. Among other things, it appears defendant filed an ARDC complaint against his first postconviction attorney (which certainly defendant may pursue, but the delay is still attributable to him), he made numerous requests of other appointed attorneys to interview witnesses and research numerous claims he wanted to include in his amended petition, his family hired a private investigator, who needed time to investigate certain topics, and he was provided drafts of amended postconviction petitions by two of his attorneys, which he refused to accept because the attorneys apparently would not include all of the claims he wanted to raise. Accordingly, we will not address this issue further.

¶ 103                                             III. CONCLUSION

¶ 104 For the reasons stated, we affirm the judgment of the trial court.

¶ 105 Affirmed.